Justice Scalia
delivered the opinion of the Court.
We decide whether § 10(b) of the Securities Exchange Act of 1934 provides a cause of action to foreign plaintiffs suing *251 foreign and American defendants for misconduct in connection with securities traded on foreign exchanges.
I
Respondent National Australia Bank Limited (National) was, during the relevant time, the largest bank in Australia. Its Ordinary Shares — what in America would be called “common stock” — are traded on the Australian Stock Exchange Limited and on other foreign securities exchanges, but not on any exchange in the United States. There are listed on the New York Stock Exchange, however, National’s American Depositary Receipts (ADRs), which represent the right to receive a specified number of National’s Ordinary Shares. 547 F. 3d 167, 168, and n. 1 (CA2 2008).
The complaint alleges the following facts, which we accept as true. In February 1998, National bought respondent HomeSide Lending, Inc., a mortgage-servicing company headquartered in Florida. HomeSide’s business was to receive fees for servicing mortgages (essentially the administrative tasks associated with collecting mortgage payments, see J. Rosenberg, Dictionary of Banking and Financial Services 600 (2d ed. 1985)). The rights to receive those fees, so-called mortgage-servicing rights, can provide a valuable income stream. See 2 The New Palgrave Dictionary of Money and Finance 817 (P. Newman, M. Milgate, & J. Eatwell eds. 1992). How valuable each of the rights is depends, in part, on the likelihood that the mortgage to which it applies will be fully repaid before it is due, terminating the need for servicing. HomeSide calculated the present value of its mortgage-servicing rights by using valuation models designed to take this likelihood into account. It recorded the value of its assets, and the numbers appeared in National’s financial statements.
From 1998 until 2001, National’s annual reports and other public documents touted the success of HomeSide’s business, and respondents Frank Cicutto (National’s managing direc *252 tor and chief executive officer), Kevin Race (HomeSide’s chief operating officer), and Hugh Harris (HomeSide’s chief executive officer) did the same in public statements. But on July 5, 2001, National announced that it was writing down the value of HomeSide’s assets by $450 million; and then again on September 3, by another $1.75 billion. The prices of both Ordinary Shares and ADRs slumped. After downplaying the July writedown, National explained the September writedown as the result of a failure to anticipate the lowering of prevailing interest rates (lower interest rates lead to more refinancings, i. e., more early repayments of mortgages), other mistaken assumptions in the financial models, and the loss of goodwill. According to the complaint, however, HomeSide, Race, Harris, and another Home-Side senior executive who is also a respondent here had manipulated HomeSide’s financial models to make the rates of early repayment unrealistically low in order to cause the mortgage-servicing rights to appear more valuable than they really were. The complaint also alleges that National and Cicutto were aware of this deception by July 2000, but did nothing about it.
As relevant here, petitioners Russell Leslie Owen and Brian and Geraldine Silverlock, all Australians, purchased National’s Ordinary Shares in 2000 and 2001, before the writedowns.[1] They sued National, HomeSide, Cicutto, and the three HomeSide executives in the United States District Court for the Southern District of New York for alleged violations of §§ 10(b) and 20(a) of the Securities Exchange Act *253 of 1934,48 Stat. 891,15 U. S. C. §§ 78j(b) and 78t(a), and Securities and Exchange Commission (SEC) Rule 10b-5, 17 CFR §240.10b-5 (2009), promulgated pursuant to § 10(b).[2] They sought to represent a class of foreign purchasers of National’s Ordinary Shares during a specified period up to the September writedown. 547 F. 3d, at 169.
Respondents moved to dismiss for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim under Rule 12(b)(6). The District Court granted the motion on the former ground, finding no jurisdiction because the acts in this country were, “at most, a link in the chain of an alleged overall securities fraud scheme that culminated abroad.” In re National Australia Bank Securities Litigation, No. 03 Civ. 6537 (BSJ), 2006 WL 3844465, *8 (SDNY, Oct. 25, 2006). The Court of Appeals for the Second Circuit affirmed on similar grounds. The acts performed in the United States did not “compris[e] the heart of the alleged fraud.” 547 F. 3d, at 175-176. We granted certiorari, 558 U. S. 1047 (2009).
II
Before addressing the question presented, we must correct a threshold error in the Second Circuit’s analysis. It considered the extraterritorial reach of § 10(b) to raise a question of subject-matter jurisdiction, wherefore it affirmed the Dis *254 trict Court’s dismissal under Rule 12(b)(1). See 547 F. 3d, at 177. In this regard it was following Circuit precedent, see Schoenbaum v. Firstbrook, 405 F. 2d 200, 208, modified on other grounds en banc, 405 F. 2d 215 (1968). The Second Circuit is hardly alone in taking this position, see, e. g., In re CP Ships Ltd. Securities Litigation, 578 F. 3d 1306, 1313 (CA11 2009); Continental Grain (Australia) Pty. Ltd. v. Pacific Oilseeds, Inc., 592 F. 2d 409, 421 (CA8 1979).
But to ask what conduct § 10(b) reaches is to ask what conduct § 10(b) prohibits, which is a merits question. Subject-matter jurisdiction, by contrast, “refers to a tribunal’s ‘ “power to hear a case.” ’ ” Union Pacific R. Co. v. Locomotive Engineers, 558 U. S. 67, 81 (2009) (quoting Arbaugh v. Y & H Corp., 546 U. S. 500, 514 (2006), in turn quoting United States v. Cotton, 535 U. S. 625, 630 (2002)). It presents an issue quite separate from the question whether the allegations the plaintiff makes entitle him to relief. See Bell v. Hood, 327 U. S. 678, 682 (1946). The District Court here had jurisdiction under 15 U. S. C. § 78aa[3] to adjudicate the question whether § 10(b) applies to National’s conduct.
In view of this error, which the parties do not dispute, petitioners ask us to remand. We think that unnecessary. Since nothing in the analysis of the .courts below turned on the mistake, a remand would only require a new Rule 12(b)(6) label for the same Rule 12(b)(1) conclusion. As we have done before in situations like this, see, e. g., Romero v. International Terminal Operating Co., 358 U. S. 354, 359, 381-384 (1959), we proceed to address whether petitioners’ allegations state a claim.
*255 III
A
It is a “longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.’ ” EEOC v. Arabian American Oil Co., 499 U. S. 244, 248 (1991) (Aramco) (quoting Foley Bros., Inc. v. Filardo, 336 U. S. 281, 285 (1949)). This principle represents a canon of construction, or a presumption about a statute’s meaning, rather than a limit upon Congress’s power to legislate, see Blackmer v. United States, 284 U. S. 421, 437 (1932). It rests on the perception that Congress ordinarily legislates with respect to domestic, not foreign, matters. Smith v. United States, 507 U. S. 197, 204, n. 5 (1993). Thus, “unless there is the affirmative intention of the Congress clearly expressed” to give a statute extraterritorial effect, “we must presume it is primarily concerned with domestic conditions.” Aramco, supra, at 248 (internal quotation marks omitted). The canon or presumption applies regardless of whether there is a risk of conflict between the American statute and a foreign law, see Sale v. Haitian Centers Council, Inc., 509 U. S. 155, 173-174 (1993). When a statute gives no clear indication of an extraterritorial application, it has none.
Despite this principle of interpretation, long and often recited in our opinions, the Second Circuit believed that, because the Exchange Act is silent as to the extraterritorial application of § 10(b), it was left to the court to “discern” whether Congress would have wanted the statute to apply. See 547 F. 3d, at 170 (internal quotation marks omitted). This disregard of the presumption against extraterritoriality did not originate with the Court of Appeals panel in this case. It has been repeated over many decades by various Courts of Appeals in determining the application of the Exchange Act, and § 10(b) in particular, to fraudulent schemes that involve conduct and effects abroad. That has produced *256 a collection of tests for divining what Congress would have wanted, complex in formulation and unpredictable in application.
As of 1967, District Courts at least in the Southern District of New York had consistently concluded that, by reason of the presumption against extraterritoriality, § 10(b) did not apply when the stock transactions underlying the violation occurred abroad. See Schoenbaum v. Firstbrook, 268 F. Supp. 385, 392 (1967) (citing Ferraioli v. Cantor, CCH Fed. Sec. L. Rep. ¶ 91615 (SDNY 1965), and Kook v. Crang, 182 F. Supp. 388, 390 (SDNY I960)). Schoenbaum involved the sale in Canada of the treasury shares of a Canadian corporation whose publicly traded shares (but not, of course, its treasury shares) were listed on both the American Stock Exchange and the Toronto Stock Exchange. Invoking the presumption against extraterritoriality, the court held that § 10(b) was inapplicable (though it incorrectly viewed the defect as jurisdictional). 268 F. Supp., at 391-392, 393-394. The decision in Schoenbaum was reversed, however, by a Second Circuit opinion which held that “neither the usual presumption against extraterritorial application of legislation nor the specific language of [§] 30(b) show Congressional intent to preclude application of the Exchange Act to transactions regarding stocks traded in the United States which are effected outside the United States . . . .” Schoenbaum, 405 F. 2d, at 206. It sufficed to apply § 10(b) that, although the transactions in treasury shares took place in Canada, they affected the value of the common shares publicly traded in the United States. See id., at 208-209. Application of § 10(b), the Second Circuit found, was “necessary to protect American investors,” id., at 206.
The Second Circuit took another step with Leasco Data Processing Equip. Corp. v. Maxwell, 468 F. 2d 1326 (1972), which involved an American company that had been fraudulently induced to buy securities in England. There, unlike in Schoenbaum, some of the deceptive conduct had occurred *257 in the United States but the corporation whose securities were traded (abroad) was not listed on any domestic exchange. Leasco said that the presumption against extraterritoriality applies only to matters over which the United States would not have prescriptive jurisdiction, 468 F. 2d, at 1334. Congress had prescriptive jurisdiction to regulate the deceptive conduct in this country, the language of the Act could be read to cover that conduct, and the court concluded that “if Congress had thought about the point,” it would have wanted § 10(b) to apply. Id., at 1334-1337.
With Schoenbaum and Leasco on the books, the Second Circuit had excised the presumption against extraterritoriality from the jurisprudence of § 10(b) and replaced it with the inquiry whether it would be reasonable (and hence what Congress would have wanted) to apply the statute to a given situation. As long as there was prescriptive jurisdiction to regulate, the Second Circuit explained, whether to apply § 10(b) even to “predominantly foreign” transactions became a matter of whether a court thought Congress “wished the precious resources of United States courts and law enforcement agencies to be devoted to them rather than leave the problem to foreign countries.” Bersch v. Drexel Firestone, Inc., 519 F. 2d 974, 985 (1975); see also IIT v. Vencap, Ltd., 519 F. 2d 1001, 1017-1018 (CA2 1975).
The Second Circuit had thus established that application of § 10(b) could be premised upon either some effect on American securities markets or investors (Schoenbaum) or significant conduct in the United States (Leasco). It later formalized these two applications into (1) an “effects test,” “whether the wrongful conduct had a substantial effect in the United States or upon United States citizens,” and (2) a “conduct test,” “whether the wrongful conduct occurred in the United States.” SEC v. Berger, 322 F. 3d 187, 192-193 (CA2 2003). These became the north star of the Second Circuit's § 10(b) jurisprudence, pointing the way to what Con *258 gress would have wished. Indeed, the Second Circuit declined to keep its two tests distinct on the ground that “an admixture or combination of the two often gives a better picture of whether there is sufficient United States involvement to justify the exercise of jurisdiction by an American court.” Itoba Ltd. v. Lep Group PLC, 54 F. 3d 118, 122 (1995). The Second Circuit never put forward a textual or even extratextual basis for these tests. As early as Bersch, it confessed that “if we were asked to point to language in the statutes, or even in the legislative history, that compelled these conclusions, we would be unable to respond,” 519 F. 2d, at 993.
As they developed, these tests were not easy to administer. The conduct test was held to apply differently depending on whether the harmed investors were Americans or foreigners: When the alleged damages consisted of losses to American investors abroad, it was enough that acts “of material importance” performed in the United States “significantly contributed” to that result; whereas those acts must have “directly caused” the result when losses to foreigners abroad were at issue. See ibid. And “merely preparatory activities in the United States” did not suffice “to trigger application of the securities laws for injury to foreigners located abroad.” Id., at 992. This required the court to distinguish between mere preparation and using the United States as a “base” for fraudulent activities in other countries. Vencap, supra, at 1017-1018. But merely satisfying the conduct test was sometimes insufficient without “‘some additional factor tipping the scales’ ” in favor of the application of American law. Interbrew v. Edperbrascan Corp., 23 F. Supp. 2d 425, 432 (SDNY 1998) (quoting Europe & Overseas Commodity Traders, S. A. v. Banque Paribas London, 147 F. 3d 118, 129 (CA2 1998)). District Courts have noted the difficulty of applying such vague formulations. See, e. g., In re Alstom SA, 406 F. Supp. 2d 346, 366-385 (SDNY 2005). There is no more damning indictment of the “con *259 duct” and “effects” tests than the Second Circuit’s own declaration that “the presence or absence of any single factor which was considered significant in other cases ... is not necessarily dispositive in future cases.” IIT v. Cornfeld, 619 F. 2d 909, 918 (1980) (internal quotation marks omitted).
Other Circuits embraced the Second Circuit’s approach, though not its precise application. Like the Second Circuit, they described their decisions regarding the extraterritorial application of § 10(b) as essentially resolving matters of policy. See, e. g., SEC v. Kasser, 548 F. 2d 109,116 (CA3 1977); Continental Grain, 592 F. 2d, at 421-422; Grunenthal GmbH v. Hotz, 712 F. 2d 421, 424-425 (CA9 1983); Kauthar SDN BHD v. Sternberg, 149 F. 3d 659, 667 (CA7 1998). While applying the same fundamental methodology of balancing interests and arriving at what seemed the best policy, they produced a proliferation of vaguely related variations on the “conduct” and “effects” tests. As described in a leading Seventh Circuit opinion: “Although the circuits . . . seem to agree that there are some transnational situations to which the antifraud provisions of the securities laws are applicable, agreement appears to end at that point.”[4] Id., at 665. See *260 also id., at 665-667 (describing the approaches of the various Circuits and adopting yet another variation).
At least one Court of Appeals has criticized this line of cases and the interpretive assumption that underlies it. In Zoelsch v. Arthur Andersen & Co., 824 F. 2d 27, 32 (1987) (Bork, J.), the District of Columbia Circuit observed that rather than courts’ “divining what ‘Congress would have wished’ if it had addressed the problem[, a] more natural inquiry might be what jurisdiction Congress in fact thought about and conferred.” Although tempted to apply the presumption against extraterritoriality and be done with it, see id., at 31-32, that court deferred to the Second Circuit because of its “preeminence in the field of securities law,” id., at 32. See also Robinson v. TCI/US West Communications Inc., 117 F. 3d 900, 906-907 (CA5 1997) (expressing agreement with Zoelsch’s criticism of the emphasis on policy considerations in some of the cases).
Commentators have criticized the unpredictable and inconsistent application of § 10(b) to transnational cases. See, e. g., Choi & Silberman, Transnational Litigation and Global Securities Class-Action Lawsuits, 2009 Wis. L. Rev. 465,467-468; Chang, Multinational Enforcement of U. S. Securities Laws: The Need for the Clear and Restrained Scope of Extraterritorial Subject-Matter Jurisdiction, 9 Ford. J. Corp. & Fin. L. 89,106-108,115-116 (2004); Langevoort, Schoenbaum Revisited: Limiting the Scope of Antifraud Protection in an Internationalized Securities Marketplace, 55 Law & Con-temp. Prob. 241, 244-248 (1992). Some have challenged the premise underlying the Courts of Appeals’ approach, namely, that Congress did not consider the extraterritorial application of § 10(b) (thereby leaving it open to the courts, supposedly, to determine what Congress would have wanted). See, e. g., Sachs, The International Reach of Rule 10b-5: The Myth of Congressional Silence, 28 Colum. J. Transnat’l L. 677 (1990) (arguing that Congress considered, but rejected, applying the Exchange Act to transactions abroad). Others, *261 more fundamentally, have noted that using congressional silence as a justification for judge-made rules violates the traditional principle that silence means no extraterritorial application. See, e. g., Note, Let There Be Fraud (Abroad): A Proposal for a New U. S. Jurisprudence with Regard to the Extraterritorial Application of the Anti-Fraud Provisions of the 1933 and 1934 Securities Acts, 28 Law & Pol’y Int’l Bus. 477, 492-493 (1997).
The criticisms seem to us justified. The results of judicial-speculation-made-law — divining what Congress would have wanted if it had thought of the situation before the court — demonstrate the wisdom of the presumption against extraterritoriality. Rather than guess anew in each case, we apply the presumption in all cases, preserving a stable background against which Congress can legislate with predictable effects.[5]
B
Rule 10b-5, the regulation under which petitioners have brought suit,[6] was promulgated under § 10(b), and “does not *262 extend beyond conduct encompassed by §10(b)’s prohibition.” United States v. O’Hagan, 521 U. S. 642, 651 (1997). Therefore, if § 10(b) is not extraterritorial, neither is Rule 10b-5.
On its face, § 10(b) contains nothing to suggest it applies abroad:
“It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
“[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered,. . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe . . . .” 15 U. S. C. 78j(b).
Petitioners and the Solicitor General contend, however, that three things indicate that § 10(b) or the Exchange Act in general has at least some extraterritorial application.
First, they point to the definition of “interstate commerce,” a term used in § 10(b), which includes “trade, commerce, transportation, or communication . . . between any foreign country and any State.” 15 U. S. C. §78c(a)(17). But “we have repeatedly held that even statutes that contain *263 broad language in their definitions of bommeree’ that expressly refer to ‘foreign commerce’ do not apply abroad.” Aramco, 499 U. S., at 251; see id., at 251-252 (discussing cases). The general reference to foreign commerce in the definition of “interstate commerce” does not defeat the presumption against extraterritoriality.[7]
Petitioners and the Solicitor General next point out that Congress, in describing the purposes of the Exchange Act, observed that the “prices established and offered in such transactions are generally disseminated and quoted throughout the United States and foreign countries.” 15 U. S. C. § 78b(2). The antecedent of “such transactions,” however, is found in the first sentence of the section, which declares that “transactions in securities as commonly conducted upon securities exchanges and over-the-counter markets are affected with a national public interest.” §78b. Nothing suggests that this national public interest pertains to transactions conducted upon foreign exchanges and markets. The fleeting reference to the dissemination and quotation abroad of the prices of securities traded in domestic exchanges and markets cannot overcome the presumption against extraterritoriality.
Finally, there is § 30(b) of the Exchange Act, 15 U. S. C. §78dd(b), which does mention the Act’s extraterritorial application: “The provisions of [the Exchange Act] or of any rule or regulation thereunder shall not apply to any person insofar as he transacts a business in securities without the *264 jurisdiction of the United States,” unless he does so in violation of regulations promulgated by the Securities and Exchange Commission “to prevent . . . evasion of [the Act].” (The parties have pointed us to no regulation promulgated pursuant to § 30(b).) The Solicitor General argues that “[this] exemption would have no function if the Act did not apply in the first instance to securities transactions that occur abroad.” Brief for United States as Amicus Curiae 14.
We are not convinced. In the first place, it would be odd for Congress to indicate the extraterritorial application of the whole Exchange Act by means of a provision imposing a condition precedent to its application abroad. And if the whole Act applied abroad, why would the Commission’s enabling regulations be limited to those preventing “evasion” of the Act, rather than all those preventing “violation”? The provision seems to us directed at actions abroad that might conceal a domestic violation, or might cause what would otherwise be a domestic violation to escape on a technicality. At most, the Solicitor General’s proposed inference is possible; but possible interpretations of statutory language do not override the presumption against extraterritoriality. See Aramco, supra, at 253.
The Solicitor General also fails to account for § 30(a), which reads in relevant part as follows:
“It shall be unlawful for any broker or dealer ... to make use of the mails or of any means or instrumentality of interstate commerce for the purpose of effecting on an exchange not within or subject to the jurisdiction of the United States, any transaction in any security the issuer of which is a resident of, or is organized under the laws of, or has its principal place of business in, a place within or subject to the jurisdiction of the United States, in contravention of such rules and regulations as the Commission may prescribe . . . .” 15 U. S. C. § 78dd(a).
*265 Subsection 30(a) contains what § 10(b) lacks: a clear statement of extraterritorial effect. Its explicit provision for a specific extraterritorial application would be quite superfluous if the rest of the Exchange Act already applied to transactions on foreign exchanges — and its limitation of that application to securities of domestic issuers would be inoperative. Even if that were not true, when a statute provides for some extraterritorial application, the presumption against extraterritoriality operates to limit that provision to its terms. See Microsoft Corp. v. AT&T Corp., 550 U. S. 437, 455-456 (2007). No one claims that § 30(a) applies here.
The concurrence claims we have impermissibly narrowed the inquiry in evaluating whether a statute applies abroad, citing for that point the dissent in Aramco, see post, at 278-279. But we do not say, as the concurrence seems to think, that the presumption against extraterritoriality is a “clear statement rule,” post, at 278, if by that is meant a requirement that a statute say “this law applies abroad.” Assuredly context can be consulted as well. But whatever sources of statutory meaning one consults to give “the most faithful reading” of the text, post, at 280, there is no clear indication of extraterritoriality here. The concurrence does not even try to refute that conclusion, but merely puts forward the same (at best) uncertain indications relied upon by petitioners and the Solicitor General. As the opinion for the Court in Aramco (which we prefer to the dissent) shows, those uncertain indications do not suffice.[8]
In short, there is no affirmative indication in the Exchange Act that § 10(b) applies extraterritorially, and we therefore conclude that it does not.
*266 IV
A
Petitioners argue that the conclusion that § 10(b) does not apply extraterritorially does not resolve this case. They contend that they seek no more than domestic application anyway, since Florida is where HomeSide and its senior executives engaged in the deceptive conduct of manipulating HomeSide’s financial models; their complaint also alleged that Race and Hughes made misleading public statements there. This is less an answer to the presumption against extraterritorial application than it is an assertion — a quite valid assertion — that that presumption here (as often) is not self-evidently dispositive, but its application requires further analysis. For it is a rare case of prohibited extraterritorial application that lacks all contact with the territory of the United States. But the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever some domestic activity is involved in the case. The concurrence seems to imagine just such a timid sentinel, see post, at 280-281, but our cases are to the contrary. In Aramco, for example, the Title VII plaintiff had been hired in Houston, and was an American citizen. See 499 U. S., at 247. The Court concluded, however, that neither that territorial event nor that relationship was the “focus” of congressional concern, id., at 255, but rather domestic employment. See also Foley Bros., 336 U. S., at 283, 285-286.
Applying the same mode of analysis here, we think that the focus of the Exchange Act is not upon the place where the deception originated, but upon purchases and sales of securities in the United States. Section 10(b) does not punish deceptive conduct, but only deceptive conduct “in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered.” 15 U. S. C. § 78j(b). See SEC v. Zandford, 535 U. S. *267 813, 820 (2002). Those purehase-and-sale transactions are the objects of the statute’s solicitude. It is those transactions that the statute seeks to “regulate,” see Superintendent of Ins. of N. Y. v. Bankers Life & Casualty Co., 404 U. S. 6,12 (1971); it is parties or prospective parties to those transactions that the statute seeks to “protee[t],” id., at 10. See also Ernst & Ernst v. Hochfelder, 425 U. S. 185, 195 (1976). And it is in our view only transactions in securities listed on domestic exchanges, and domestic transactions in other securities, to which § 10(b) applies.[9]
The primacy of the domestic exchange is suggested by the very prologue of the Exchange Act, which sets forth as its object “[t]o provide for the regulation of securities exchanges . . . operating in interstate and foreign commerce and-through the mails, to prevent inequitable and unfair practices on such exchanges . . . .” 48 Stat. 881. We know of no one who thought that the Act was intended to “regulat[e]” foreign securities exchanges — or indeed who even believed that under established principles of international law Congress had the power to do so. The Act’s registration requirements apply only to securities listed on national securities exchanges. 15 U. S. C. § 78£(a).
*268 With regard to securities not registered on domestic exchanges, the exclusive focus on domestic purchases and sales[10] is strongly confirmed by § 30(a) and (b), discussed earlier. The former extends the normal scope of the Exchange Act’s prohibitions to acts effecting, in violation of rules prescribed by the Commission, a “transaction” in a United States security “on an exchange not within or subject to the jurisdiction of the United States.” §78dd(a). And the latter specifies that the Act does not apply to “any person insofar as he transacts a business in securities without the jurisdiction of the United States,” unless he does so in violation of regulations promulgated by the Commission “to prevent the evasion [of the Act].” § 78dd(b). Under both provisions it is the foreign location of the transaction that establishes (or reflects the presumption of) the Act’s inapplicability, absent regulations by the Commission.
The same focus on domestic transactions is evident in the Securities Act of 1933, 48 Stat. 74, enacted by the same Congress as the Exchange Act, and forming part of the same comprehensive regulation of securities trading. See Central Bank of Denver, N. A. v. First Interstate Bank of Denver, N. A., 511 U. S. 164, 170-171 (1994). That legislation makes it unlawful to sell a security, through a prospectus or otherwise, making use of “any means or instruments of transportation or communication in interstate commerce or of the mails,” unless a registration statement is in effect. *269 15 U. S. C. § 77e(a)(l). The Commission has interpreted that requirement “not to include . . . sales that occur outside the United States.” 17 CFR § 230.901 (2009).
Finally, we reject the notion that the Exchange Act reaches conduct in this country affecting exchanges or transactions abroad for the same reason that Aramco rejected overseas application of Title YII to all domestically concluded employment contracts or all employment contracts with American employers: The probability of incompatibility with the applicable laws of other countries is so obvious that if Congress intended such foreign application “it would have addressed the subject of conflicts with foreign laws and procedures.” 499 U. S., at 256. Like the United States, foreign countries regulate their domestic securities exchanges and securities transactions occurring within their territorial jurisdiction. And the regulation of other countries often differs from ours as to what constitutes fraud, what disclosures must be made, what damages are recoverable, what discovery is available in litigation, what individual actions may be joined in a single suit, what attorney’s fees are recoverable, and many other matters. See, e. g., Brief for United Kingdom of Great Britain and Northern Ireland as Amicus Curiae 16-21. The Commonwealth of Australia, the United Kingdom of Great Britain and Northern Ireland, and the Republic of France have filed amicus briefs in this case. So have (separately or jointly) such international and foreign organizations as the International Chamber of Commerce, the Swiss Bankers Association, the Federation of German Industries, the French Business Confederation, the Institute of International Bankers, the European Banking Federation, the Australian Bankers’ Association, and the Association Frangaise des Entreprises Privées. They all complain of the interference with foreign securities regulation that application of § 10(b) abroad would produce, and urge the adoption of a clear test that will avoid that consequence. The transactional test we have adopted — whether the purchase or sale *270 is made in the United States, or involves a security listed on a domestic exchange — meets that requirement.
B
The Solicitor General suggests a different test, which petitioners also endorse: “[A] transnational securities fraud violates [§] 10(b) when the fraud involves significant conduct in the United States that is material to the fraud’s success.” Brief for United States as Amicus Curiae 16; see Brief for Petitioners 26. Neither the Solicitor General nor petitioners provide any textual support for this test. The Solicitor General sets forth a number of purposes such a test would serve: achieving a high standard of business ethics in the securities industry, ensuring honest securities markets and thereby promoting investor confidence, and preventing the United States from becoming a “Barbary Coast” for malefactors perpetrating frauds in foreign markets. Brief for United States as Amicus Curiae 16-17. But it provides no textual support for the last of these purposes, or for the first two as applied to the foreign securities industry and securities markets abroad. It is our function to give the statute the effect its language suggests, however modest that may be; not to extend it to admirable purposes it might be used to achieve.
If, moreover, one is to be attracted by the desirable consequences of the “significant and material conduct” test, one should also be repulsed by its adverse consequences. While there is no reason to believe that the United States has become the Barbary Coast for those perpetrating frauds on foreign securities markets, some fear that it has become the Shangri-La of class-action litigation for lawyers representing those allegedly cheated in foreign securities markets. See Brief for Infineon Technologies AG as Amicus Curiae 1-2, 22-25; Brief for European Aeronautic Defence & Space Co. N. V. et al. as Amici Curiae 2-4; Brief for Securities Industry and Financial Markets Association et al. as Amici Curiae *271 10-16; Coffee, Securities Policeman to the World? The Cost of Global Class Actions, N. Y. L. J. 5 (2008); S. Grant & D. Zilka, The Current Role of Foreign Investors in Federal Securities Class Actions, PLI Corporate Law and Practice Handbook Series, PLI Order No. 11072, pp. 15-16 (Sept.-Oct. 2007); Buxbaum, Multinational Class Actions Under Federal Securities Law: Managing Jurisdictional Conflict, 46 Colum. J. Transnat’l L. 14, 38-41 (2007).
As case support for the “significant and material conduct” test, the Solicitor General relies primarily on Pasquantino v. United States, 544 U. S. 349 (2005).[11] In that case we concluded that the wire-fraud statute, 18 U. S. C. § 1343 (2000 ed., Supp. II), was violated by defendants who ordered liquor over the phone from a store in Maryland with the intent to -smuggle it into Canada and deprive the Canadian Government of revenue. 544 U. S., at 353, 371. Section 1343 prohibits “any scheme or artifice to defraud,” — fraud simplic *272 iter, without any requirement that it be “in connection with” any particular transaction or event. The Pasquantino Court said that the petitioners’ “offense was complete the moment they executed the scheme inside the United States,” and that it was “[t]his domestic element of petitioners’ conduct [that] the Government is punishing.” Id., at 371. Section 10(b), by contrast, punishes not all acts of deception, but only such acts “in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered.” Not deception alone, but deception with respect to certain purchases or sales is necessary for a violation of the statute.
The Solicitor General points out that the “significant and material conduct” test is in accord with prevailing notions of international comity. If so, that proves that if the United States asserted prescriptive jurisdiction pursuant to the “significant and material conduct” test it would not violate customary international law; but it in no way tends to prove that that is what Congress has done.
Finally, the Solicitor General argues that the Commission has adopted an interpretation similar to the “significant and material conduct” test, and that we should defer to that. In the two adjudications the Solicitor General cites, however, the Commission did not purport to be providing its own interpretation of the statute, but relied on decisions of federal courts — mainly Court of Appeals decisions that in turn relied on the Schoenbaum and Leasco decisions of the Second Circuit that we discussed earlier. See In re U S. Securities Clearing Corp., 52 S. E. C. 92, 95, n. 14, 96, n. 16 (1994); In re Robert F. Lynch, Exchange Act Release No. 11737, 8 S. E. C. Docket 75, 77, 78, n. 15 (1975). We need “accept only those agency interpretations that are reasonable in light of the principles of construction courts normally employ.” Aramco, 499 U. S., at 260 (Scalia, J., concurring in part and concurring in judgment). Since the Commission’s interpretations relied on cases we disapprove, which ignored or dis *273 carded the presumption against extraterritoriality, we owe them no deference.
* * *
Section 10(b) reaches the use of a manipulative or deceptive device or contrivance only in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States. This case involves no securities listed on a domestic exchange, and all aspects of the purchases complained of by those petitioners who still have live claims occurred outside the United States. Petitioners have therefore failed to state a claim on which relief can be granted. We affirm the dismissal of petitioners’ complaint on this ground.

It is so ordered.

Justice Sotomayor took no part in the consideration or decision of this case.

 Robert Morrison, an American investor in National’s ADRs, also brought suit, but his claims were dismissed by the District Court because he failed to allege damages. In re National Australia Bank Securities Litigation, No. 03 Civ. 6537 (BSJ), 2006 WL 3844465, *9 (SDNY, Oct. 25, 2006). Petitioners did not appeal that decision, 547 F. 3d 167, 170, n. 3 (CA2 2008) (ease below), and it is not before us. Inexplicably, Morrison continued to be listed as a petitioner in the Court of Appeals and here.

 The relevant text of § 10(b) and SEC Rule 10b-5 are set forth later in this opinion. Section 20(a), 48 Stat. 899, provides:
“Every person who, directly or indirectly, controls any person liable under any provision of [the Exchange Act] or of any rule or regulation thereunder shall also be hable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.”
Liability under § 20(a) is obviously derivative of liability under some other provision of the Exchange Act; § 10(b) is the only basis petitioners asserted.

 Section 78aa provides:
“The district courts of the United States ... shall have exclusive jurisdiction of violations of [the Exchange Act] or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by [the Exchange Act] or the rules and regulations thereunder.”

 The principal concurrence (see post, p. 274 (Stevens, J., concurring in judgment) (hereinafter concurrence)) disputes this characterization, launching into a Homeric simile which takes as its point of departure (and mistakes for praise rather than condemnation) then-Justice Rehnquist’s statement in Blue Chip Stamps v. Manor Drug Stores, 421 U. S. 723, 737 (1975), that “ ‘[w]hen we deal with private actions under Rule 10b-5, ... we deal with a judicial oak which has grown from little more than a legislative acorn.’ ” Post, at 276. The concurrence seemingly believes that the Courts of Appeals have carefully trimmed and sculpted this “judicial oak” into a cohesive canopy, under the watchful eye of Judge Henry Friendly, the “master arborist,” ibid. See post, at 274-276. Even if one thinks that the “conduct” and “effects” tests are numbered among Judge Friendly’s many fine contributions to the law, his successors, though perhaps under the impression that they nurture the same mighty oak, are in reality tending each its own botanically distinct tree. It is telling that the concurrence never attempts its own synthesis of the various balancing tests the Circuits have adopted.

 The concurrence urges us to cast aside our inhibitions and join in the judicial lawmaking, because “[t]his entire area of law is replete with judge-made rules,” post, at 276. It is doubtless true that, because the implied private cause of action under § 10(b) and Rule 10b-5 is a thing of our own creation, we have also defined its contours. See, e. g., Blue Chip Stamps, supra. But when it comes to “the scope of [the] conduct prohibited by [Rule 10b-5 and] § 10(b), the text of the statute controls our decision.” Central Bank of Denver, N. A. v. First Interstate Bank of Denver, N. A, 511 U. S. 164, 173 (1994). It is only with respect to the additional “elements of the 10b-5 private liability scheme” that we “have had ‘to infer how the 1934 Congress would have addressed the issue[s] had the 10b-5 action been included as an express provision in the 1934 Act.’” Ibid, (quoting Musick, Peeler & Garrett v. Employers Ins. of Wausau, 508 U. S. 286, 294 (1993)).

 Rule 10b-5 makes it unlawful:
“for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
“(a) To employ any device, scheme, or artifice to defraud,
*262 “(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
“(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.” 17 CFR § 240.10b-5 (2009).
The Second Circuit considered petitioners’ appeal to raise only a claim under Rule 10b-5(b), since it found their claims under subsections (a) and (c) to be forfeited. 547 F. 3d, at 176, n. 7. We do likewise.

 This conclusion does not render meaningless the inclusion of “trade, commerce, transportation, or communication . . . between any foreign country and any State” in the definition of “interstate commerce.” 15 U. S. C. § 78c(a)(17). For example, an issuer based abroad, whose executives approve the publication in the United States of misleading information affecting the price of the issuer’s securities traded on the New York Stock Exchange, probably will make use of some instrumentality of “communication . .. between [a] foreign country and [a] State.”

 The concurrence notes that, post-Aramco, Congress provided explicitly for extraterritorial application of Title VII, the statute at issue in Aramco. Post, at 279, n. 6. All this shows is that Congress knows how to give a statute explicit extraterritorial effect — and how to limit that effect to particular applications, which is what the cited amendment did. See Civil Rights Act of 1991, § 109, 105 Stat. 1077.

 The concurrence seems to think this test has little to do with our conclusion in Part III, supra, that § 10(b) does not apply extraterritorially. See post, at 284-285. That is not so. If § 10(b) did apply abroad, we would not need to determine which transnational frauds it applied to; it would apply to all of them (barring some other limitation). Thus, although it is true, as we have said, that our threshold conclusion that § 10(b) has no extraterritorial effect does not resolve this ease, it is a necessary first step in the analysis.
The concurrence also makes the curious criticism that our evaluation of where a putative violation occurs is based on the text of § 10(b) rather than the doctrine in the Courts of Appeals. Post, at 274-275. Although it concedes that our test is textually plausible, post, at 274, it does not (and cannot) make the same claim for the Court-of-Appeals doctrine it endorses. That is enough to make our test the better one.

 That is in our view the meaning which the presumption against extraterritorial application requires for the words “purchase or sale of... any security not so registered” in § 10(b)’s phrase “in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered.” (Emphasis added.) Even without the presumption against extraterritorial application, the only alternative to that reading makes nonsense of the phrase, causing it to eover all purchases and sales of registered securities, and all purchases and sales of nonregistered securities — a thought which, if intended, would surely have been expressed by the simpler phrase “all purchases and sales of securities.”

 Discussed in Brief for United States as Amicus Curiae 22-23. The Solicitor General also cites, without description, a number of antitrust cases to support the proposition that domestic conduct with consequences abroad can be covered even by a statute that does not apply extraterritorially: Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U. S. 690 (1962); United States v. Sisal Sales Corp., 274 U. S. 268 (1927); Thomsen v. Cay ser, 243 U. S. 66 (1917); United States v. Pacific & Arctic R. & Nav. Co., 228 U. S. 87 (1913). These are no longer of relevance to the point (if they ever were), since Continental Ore overruled the holding of American Banana Co. v. United Fruit Co., 213 U. S. 347, 357 (1909), that the antitrust laws do not apply extraterritorially. See W. S. Kirkpatrick & Co. v. Environmental Tectonics Corp., Int'l, 493 U. S. 400, 407-408 (1990). Moreover, the pre-Continental Ore cases all involved conspiracies to restrain trade in the United States, see Sisal Sales, supra, at 274-276; Thomsen, supra, at 88; Pacific & Arctic, supra, at 105-106. And although a final case cited by the Solicitor General, Steele v. Bulova Watch Co., 344 U. S. 280, 287-288 (1952), might be read to permit application of a nonextraterritorial statute whenever conduct in the United States contributes to a violation abroad, we have since read it as interpreting the statute at issue — the Lanham Act — to have extraterritorial effect, Aramco, 499 U. S. 244, 252 (1991) (quoting 15 U. S. C. § 1127).