Luckert, J., dissenting:
The majority emphasizes the communications between Minnesotans David G. Lundberg and Michael L. Elzufon and the California intermediaries, who then extended offers to the California investors to conclude no sale *1128 occurred nor offer of sale originated in Kansas. In doing so, the majority gives lip service to the history and purpose of Kansas securities laws. Over 100 years ago, Kansas Bank Commissioner J.N. Dolley began to advocate for securities regulation. Over that century-plus, "[t]hat system has matured and become much more complex, but its fundamental nature is the same. One hundred years later, securities regulators 'continue to hold true to Commissioner Dolley's mission to protect citizens from "fakers with worthless stock to sell." ' " Fleming, 100 Years of Securities Law: Examining a Foundation Laid in the Kansas Blue Sky , 50 Washburn L.J. 583, 609 (2011) (quoting A Century of Investor Protection , 2010-2011 N. Am. Sec. Administrators Ass'n Ann. Rep. 7). Until today, commentators and historians have recognized that Kansas law allowed the "revolutionary idea of one man to germinate and sprout, ultimately leading to one of the most robust regulatory regimes in the modern economy." 50 Washburn L.J. at 584. Through the majority's holding, after today, it becomes a regulatory regime easily skirted by simply stepping across the state line when performing certain acts on behalf of a Kansas LLC otherwise conducting business in Kansas.
I would not allow this circumvention of Kansas law because I adopt a different view of the transactions at issue from the one taken by the majority. I interpret the offers as originating with and the sales being made by the Kansas LLCs, the only persons offering any investment opportunity. These LLCs acted through their officers and shareholders-Lundberg and Elzufon-to retain the California intermediaries who extended the Kansas LLCs' offers to California investors. Another way to look at it is to say the Kansas LLCs committed the crimes for which Lundberg and Elzufon stand accused. The LLCs are defined as persons by the Kansas Uniform Securities Act (KUSA), K.S.A. 17-12a101 et seq., and as such, the State could charge the LLCs just as their members and officers have been. Cf. State v. Spencer Gifts , 304 Kan. 755, 374 P.3d 680 (2016) (involving criminal charges against an LLC for promoting obscenity harmful to minors).
To better understand this position, it is useful to consider some underlying legal principles about business enterprises such as the LLCs here. A limited liability company is a creature of statute, defined as a person by Kansas law. See K.S.A. 2018 Supp. 17-7662 et seq. ; K.S.A. 2018 Supp. 17-7663(l) (defining "person" to include a limited liability company); see also Black's Law Dictionary 340 (10th ed. 2014) (defining a "limited-liability company" as "[a] statutorily authorized business entity that is characterized by limited liability for and management by its members and managers, and taxable as a partnership for federal income-tax purposes"). Thus, an LLC may act as a natural person, distinct from its members and within the framework of Kansas LLC law and the LLC's organizing documents. See K.S.A. 2018 Supp. 17-7668 ; Matney v. Matney Chiropractic Clinic , 268 Kan. 336, 341, 995 P.2d 871 (2000).
As a practical matter, criminally charging the LLCs makes little sense here. They no longer exist as going concerns; they cannot be imprisoned; and they apparently no longer hold any assets that could pay fines. But to the extent wrongdoing occurred, it was committed by the LLCs during their existence. An LLC exists only as a legal creation, however. To accomplish anything, an LLC must rely on natural beings-that is, living, breathing people-to act on its behalf. The Kansas LLCs did so here through their members and officers-Lundberg and Elzufon-who recruited the California intermediaries to secure investors for the Kansas LLCs.
To say the offers do not originate in Kansas ignores this practical reality that any offer made starts with the issuer, which is also the entity seeking to benefit from that investment. Here, the Kansas LLCs sought capital for their various development projects in Wichita. People acting on their behalf, first Lundberg and Elzufon, then later the California intermediaries Lundberg and Elzufon recruited, solicited investments in the Kansas LLCs. These solicitations are offers of sales. Although communicated by California intermediaries to California investors, those communications originated with the companies *1129 seeking the capital inflow-the Kansas LLCs. And those LLCs had places of business and real property holdings that were the purpose of that business here in Kansas. I, therefore, conclude jurisdiction exists over Lundberg and Elzufon because the subject sales were made in or the subject offers originated in Kansas.
These facts cause this case to fall directly within the reach of the Kansas Uniform Securities Act (KUSA), K.S.A. 17-12a101 et seq. K.S.A. 17-12a610(c) includes within the jurisdiction of Kansas courts any offer to sell "made in this state, whether or not either party is then present in this state, if the offer (1) [o ]riginates from within this state ; or (2) is directed by the offeror to a place in this state and received at the place to which it is directed." (Emphasis added.) The offers to sell at issue originated in this state through the actions of the LLCs in Kansas.
This approach dovetails with some of our earliest securities caselaw. In Daniels v. Craiglow , 131 Kan. 500, 292 P. 771 (1930), an investor sued three of a company's directors and officers (the president, treasurer, and secretary) after her investment became worthless. In considering who violated Kansas Blue Sky Law, this court held the statute was to be liberally interpreted to prevent fraud. See 131 Kan. at 502, 292 P. 771. It also noted:
"The company sold shares of its stock to plaintiff. While Smith [the company's director and vice president] conducted the negotiations, he was not seller. The shares were unsubscribed shares, nobody had power to pass title to them except the directors acting as managers of the affairs of the corporation (R.S. 17-608), and the corporation sold the shares as principal acting through the directors as agents." ( Emphases added.) 131 Kan. at 502, 292 P. 771.
The sale to the investor was unlawful because it did not comply with statutory requirements for the sale of speculative securities. This court then held the three defendants could be held personally liable to plaintiff for the purchase prices based on their "active participation in the sale," which included accepting the investor's payment and issuing share certificates that two of the directors signed. In addition, "whether or not what defendants did constituted active participation in the sale, their conduct bore such a relation to the unlawful sale they must restore to plaintiff the price she paid for the shares sold to her." 131 Kan. at 503, 292 P. 771. It, thus, is not unprecedented in Kansas law for officers of a corporation to bear responsibility for a Kansas business' acts that violate Kansas law.
This approach best gives effect to the plain language of the KUSA. K.S.A. 17-12a610(c) acknowledges that a sale or offer to sell can be made in a state, "whether or not either party is then present " in the state. (Emphasis added.) A treatise acknowledged:
"Upon first reading, this provision would appear to be meaningless gobbledygook. How could a local statute be held to apply where neither party is present within a state without violating the maxim that state laws, including securities acts, are not to be given extraterritorial effect? However, the meaning and importance of this clause becomes clear when it is realized that the draftsmen have substituted the term 'party' for the normally used term 'principal.' Thus, while neither principal to a transaction may be physically within the state, one or more of the principals may be represented by an agent, who is physically within that state. In these cases, the action of the agent is equivalent to the action of the principal, ... bring[ing] into play the local statute, without violating the rules against extraterritorial application because the agent or agents are physically present within the state whose law attaches." 12 Blue Sky Law § 4:36 (2018).
Here, the party or principal, the various LLCs, remained in the State. The agent avoided the State while executing relevant documents. But that voluntary absence from the State does not undo the relationship with the Kansas LLCs on whose behalf they acted. Our statute applies to the sale by the Kansas LLCs.
*1130 In a case with similar facts, a leading treatise recognized the state of the issuer-seller could have applied its laws. In Neils v. Black & Co. , CCH Blue Sky L. Rptr. ¶ 71,017 (D. Or. 1972), an agent in Washington called his client in Oregon about a potential investment in a California company. The Oregon client called the California company and purchased some of its securities. The Washington agent received a commission on the sale. The treatise recognized the Neils court applied Oregon securities law but noted it "could also have applied either the Washington or California acts." 12 Blue Sky Law § 4:1.
Here, we have the Kansas LLCs through officers and owners recruiting agents in California to solicit-and in many cases in fact procure-investment in the Kansas LLCs. The Kansas LLCs then issued the investments. Those instruments may have been signed out of state because the Kansas LLCs' officers and owners maintained offices both in Kansas and Minnesota. But their location out of state does not undermine the role of the Kansas LLCs in this transaction. It was those LLCs that recruited others to make the offers that led to the securities transactions at issue. And it was those LLCs that entered the agreements with investors, even if the documents evidencing the transactions were signed outside Kansas. I would find these facts sufficient to say the sales or offers to sell originated in Kansas, and therefore application of Kansas law and jurisdiction is proper.
This is not to say that all sales or offers to sell by a Kansas-registered business entity will necessarily be subject to Kansas securities law and jurisdiction. A New Jersey case demonstrates a reasonable potential limit to such an approach. See In re Information Resources Corp. , 126 N.J. Super. 42, 312 A.2d 671 (1973).
There, the New Jersey Bureau of Securities prohibited Information Resources Corp. (IRC) from registering securities or being exempt from registration requirements for a year based on the Bureau's belief that IRC issued more securities than the law allowed in order to qualify for an exemption from New Jersey's registration requirements. IRC began its corporate existence and initially maintained its offices in New Jersey. About a year after its incorporation, IRC moved its offices to New York City. IRC issued a single class of common stock to 20 individuals. Eight purchasers were in New Jersey; 11 were residents of and acquired their shares in New York; and 1 purchaser was in Maryland. The Bureau Chief focused on another time period in which IRC sold shares to 17 people, 8 of whom were New Jersey residents. Under New Jersey law, transactions offered to no more than 10 persons in New Jersey were exempt from registration requirements. To bring the transaction within the New Jersey law, the Bureau argued that offers or sales made by the company after its relocation to New York City to persons outside New Jersey occurred in New Jersey based solely on the fact of the company's formation and organization there.
The court rejected the Bureau's position, emphasizing that no part of the sales to New York and Maryland residents involved offers, acceptances, and completed sales that occurred in New Jersey. See 126 N.J. Super. at 48-49, 312 A.2d 671. The court found only eight or nine transactions occurred in New Jersey, and thus the securities fell within the New Jersey registration exemption. The court reversed the Bureau's prohibitions on IRC. See 126 N.J. Super. at 50, 312 A.2d 671.
Our case is distinguishable from In re Information Resources Corp. , however. This is not a case in which the only connection between the LLCs and Kansas is the fact of their business formation under our laws. Rather, this is a case in which the very purposes for these entities' existence was the revitalization of real property in downtown Wichita. And to fulfill that purpose, the LLCs maintained a principal place of business in Kansas as well as Minnesota and issued securities to raise capital. Any other interpretation leads to the exact problem the majority identifies-Kansas becomes a preferred location for the unscrupulous.
Lundberg argued on review that application of our securities law to him would violate the dormant Commerce Clause of the United States Constitution. He relies on three cases for that proposition:
*1131 Morrison v. National Australia Bank, Ltd. , 561 U.S. 247, 130 S. Ct. 2869, 177 L. Ed. 2d 535 (2010) ; Edgar v. MITE Corp. , 457 U.S. 624, 102 S. Ct. 2629, 73 L. Ed. 2d 269 (1982) ; and In re National Century Financial Enterprises, Inc. , 755 F. Supp. 2d 857 (S.D. Ohio 2010). I find these cases distinguishable and therefore conclude the dormant Commerce Clause does not bar application of Kansas law here.
In National Century , securities purchasers filed a civil action alleging National Century and others engaged in fraud. National Century and its subsidiaries, all of which were Ohio corporations, issued notes that Credit Suisse, as National Century's "agent and financial advisor in connection with the marketing" of the notes would purchase at a discount. National Century , 755 F. Supp. 2d at 861. Credit Suisse, a Delaware corporation with its principal place of business in New York, would then use a placement agent to resell the notes to institutional buyers. Credit Suisse's closings and note deliveries occurred in New York. When National Century collapsed, the institutional noteholders alleged fraud as well as other violations of the Ohio Securities Act. The Noteholders argued Credit Suisse was a joint seller of the notes and liable secondarily because it " 'participated in or aided the seller in any way in making such sale.' " 755 F. Supp. 2d at 860-61.
The federal district court hearing National Century noted it had to follow Federated Mgmt. Co. v. Coopers & Lybrand , 137 Ohio App. 3d 366, 738 N.E.2d 842 (2000), in which an Ohio state court had interpreted Ohio's security law to apply to "a securities transaction between a non-Ohio seller and non-Ohio buyer, so long as the issuer is from Ohio and the seller has 'significant contacts' with the issuer." But the National Century court noted "a different question is whether the Commerce Clause permits" its application. 755 F. Supp. 2d at 875. Credit Suisse had argued applying the Act violated the Commerce Clause, specifically the extraterroriality principle, which " 'precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State.' " 755 F. Supp. 2d at 875 (quoting Edgar v. MITE Corp. , 457 U.S. 624, 642-43, 102 S. Ct. 2629, 73 L. Ed. 2d 269 [1982] [plurality opinion] ).
The National Century court reviewed the approaches to the Commerce Clause inquiry used in MITE and CTS Corp. v. Dynamics Corp. of America., 481 U.S. 69, 107 S. Ct. 1637, 95 L. Ed. 2d 67 (1987). The court highlighted language from CTS emphasizing the role of state law in authorizing or creating business entities: "State regulation of corporate governance is regulation of entities whose very existence and attributes are a product of state law." 755 F. Supp. 2d at 878 (quoting CTS , 481 U.S. at 89, 107 S.Ct. 1637 ). Based on its review of those cases and circuit cases applying them, the National Century court determined that "[t]he key inquiry is whether the regulation would control conduct occurring wholly outside the state's boundaries." 755 F. Supp. 2d at 879.
In deciding against applying Ohio law, the National Century court noted neither the place of contract nor performance was Ohio, nor did any offer originate from Ohio. Rather, the connection to Ohio was solely based on the securities being issued by an entity organized under Ohio law. 755 F. Supp. 2d at 880. The court distinguished applying the Commerce Clause in National Century from other cases that rejected Commerce Clause challenges because in those cases "either the seller or buyer participated in the sale from the state of the challenged law." 755 F. Supp. 2d at 881.
The noteholders argued the conduct regulated by the Ohio Act was the fraud, which occurred in Ohio with Credit Suisse participating or aiding the fraud from outside the state. The National Century court rejected the argument, concluding the conduct regulated was the securities transaction, not the fraud. 755 F. Supp. 2d at 882. The court found support for this position in Morrison , 561 U.S. 247, 130 S.Ct. 2869, which it characterized as announcing a "transactional test" that focused on the situs of the transaction, not the fraud. See National Century , 755 F. Supp. 2d at 883-84.
The National Century court held that "under the transaction test, the conduct being regulated by the Ohio Securities Act is the sale and purchase of securities. The sales *1132 between Credit Suisse and the Noteholders occurred wholly outside of Ohio; thus, applying [the Ohio Act] to the transactions would violate the extraterritoriality principle of the Commerce Clause." 755 F. Supp. 2d at 888.
I agree with much of the National Century analysis. But our case is distinguishable in one outcome-determinative regard-the securities here were sold directly by the Kansas LLCs for their own accounts. In National Century , Credit Suisse first purchased the securities and then later sold them to other purchasers through a second transaction. The fact that persons acting for the Kansas LLCs chose to execute the paperwork evidencing these transactions outside our territorial jurisdiction does not change the fact that the entities selling the securities and obligated under the agreements Lundberg and Elzufon signed were the Kansas LLCs for whom they acted. To the extent that any of the sales agreements were entered with someone other than a Kansas LLC, as some evidence suggests some offerings made by one of the California intermediaries may have been, then a different rule might apply. But for those executed by the Kansas LLCs, both the sale and offer occurred in Kansas under the KUSA and that suffices for jurisdiction over the persons who executed those agreements on behalf of the Kansas LLCs.
The LLCs were creatures of Kansas statute. They were party to the securities investment agreements, and they issued those securities. "Obviously, the power of a state to effect legal consequences is not limited to occurrences within the state if it has control over the status which gives rise to those consequences." Alaska Packers Ass'n v. Industrial Acc. Com'n , 294 U.S. 532, 541, 55 S. Ct. 518, 79 L. Ed. 1044 (1935). Thus, applying the KUSA here does not violate any federal constitutional restriction against extraterritorial application of Kansas law.
I would affirm the Court of Appeals for the reasons stated in this dissent.
Beier and Rosen, JJ., join the foregoing dissenting opinion.