# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 19-2795

PETER VAN DERMARK, APPELLANT,

V.

DENIS MCDONOUGH,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Argued October 20, 2020                                       Decided June 1, 2021)

*Luke D. Miller*, of Salem, Oregon, for the appellant.

*James R. Drysdale*, with whom *William A. Hudson, Jr.*, Acting General Counsel; *Mary Ann Flynn*, Chief Counsel; and *Anna Whited*, Deputy Chief Counsel, were on the brief, all of Washington, D.C., for the appellee.

*John D. Niles*, *Barton F. Stichman*, *Chris Childs*, and *Emily Wexler* were on the brief, all of Washington, D.C., for the National Veterans Legal Services Program and the Modern Military Association of America as amici curiae.

Before PIETSCH, GREENBERG, and TOTH, *Judges*.

TOTH, *Judge*, filed the opinion of the Court. GREENBERG, *Judge*, filed a dissenting opinion.

TOTH, *Judge*: Veteran Peter Van Dermark appeals a Board decision denying reimbursement for cardiac treatments at Bangkok Hospital in May 2016 and May 2018. He asserts that these were emergency treatments and that two statutes, 38 U.S.C. §§ 1725 and 1728, require VA to reimburse him for any money he personally expended for this care. The Board disagreed, concluding that these statutes were not applicable outside the United States. Instead, it found that 38 U.S.C. § 1724 and relevant VA regulations governed and barred VA from furnishing—that is, paying for—cardiac treatment outside the United States because such a condition was not connected to service. Because we agree that section 1724 generally bars the Secretary from paying for emergency treatment abroad of a non-service-connected condition, the Court affirms the Board decision.

# I. BACKGROUND

## A. Law

This case concerns the interaction of three statutes within chapter 17 of title 38 of the U.S. Code: sections 1724, 1725, and 1728. We start with an overview of each.

*1.*

The first is 38 U.S.C. § 1724, entitled "Hospital care, medical services and nursing home care abroad." It is the only statutory provision that expressly addresses VA's healthcare obligations outside the United States. At present, it instructs that "the Secretary shall not furnish hospital or domiciliary care or medical services outside any State."[1] 38 U.S.C. § 1724(a).

Subsections (b) and (c) of the statute create explicit exceptions to this prohibition. Under (b)(1), VA "may furnish" medical services and hospital care abroad to a U.S. citizen veteran "who is otherwise eligible to receive" them when necessary for treatment of a service-connected disability or as part of a rehabilitation program. Under (b)(2), the Secretary has discretion to furnish non-citizen veterans in the Philippines or Canada care and services for service-connected disabilities if he determines the care to be appropriate and feasible. Subsection (c) allows the Secretary, "[w]ithin the limits of those facilities of the Veterans Memorial Medical Center at Manila, Republic of the Philippines, for which the Secretary may contract," to "furnish necessary hospital care to a veteran for any non-service-connected disability if such veteran is unable to defray the expenses of necessary hospital care."

Finally, the statute allows the Secretary, "[w]ithin the limits of an outpatient clinic in the Republic of the Philippines that is under the direct jurisdiction of the Secretary," to "furnish a veteran who has a service-connected disability with such medical services as the Secretary determines to be needed." 38 U.S.C. § 1724(e).

VA implemented this statute by establishing the Foreign Medical Program (FMP) to "furnish hospital care and outpatient services to any veteran outside of the United States, without regard to the veteran's citizenship" if such care and services are "necessary for treatment of a service-connected disability, or any disability associated with and held to be aggravating a service-connected disability," or are "furnished to a veteran participating in a rehabilitation program under . . . chapter 31." 38 C.F.R. § 17.35(a)(1)-(2) (2020). Subsection (b) addresses the special

---

[1] "The term 'State' means each of the several States, Territories, and possessions of the United States, the District of Columbia, and the Commonwealth of Puerto Rico." 38 U.S.C. § 101(20).

circumstances regarding treatment in the Philippines. "Claims for payment or reimbursement for services not previously authorized by VA under this section are governed by §§ 17.123-17.127 and 17.129-17.132." 38 U.S.C. § 17.35(c).

*2.*

Next to be enacted, in 1973, was section 1728, which instructs the Secretary to "reimburse veterans eligible for hospital care or medical services . . . for the customary and usual charges of emergency treatment (including travel and incidental expenses under [certain terms and conditions])" when such emergency treatment was rendered outside the VA system for any of the following: (1) an "adjudicated" service-connected disability; (2) a non-service-connected disability "associated with and held to be aggravating a service-connected disability"; (3) any disability, if a veteran has a permanent total disability; or (4) any illness, injury, or dental condition of a veteran in a rehabilitation program where the care or treatment is necessary to facilitate entrance into or continuation of that program. 38 U.S.C. § 1728(a).

The implementing regulation, 38 C.F.R. § 17.120, reiterates these criteria without much elaboration except for (a)(3), with respect to which it provides: "For any disability of a veteran who has a total disability permanent in nature resulting from a service-connected disability (does not apply outside of the States, Territories, and possessions of the United States, the District of Columbia, and the Commonwealth of Puerto Rico)." 38 C.F.R. § 17.120(a)(3) (2020). Prior to its recodification in 1996, this regulation was located at 38 C.F.R. § 1780. *See* 61 Fed. Reg. 21,965, 21,968 (May 13, 1996). The parenthetical language was added in 1986 "to more accurately define the eligibility requirements for claims filed for VA payment of unauthorized medical services." 51 Fed. Reg. 8672, 8672 (Mar. 13, 1986).

Originally, section 1728 did not define "emergency treatment," *see* Pub. L. No. 93-82, Title I, § 106(a), 87 Stat. 179, 183 (Aug. 2, 1973), but Congress eventually assigned it the same meaning as it bore in the later-enacted section 1725. 38 U.S.C. § 1728(c). We turn to that final section now.

*3.*

Section 1725 was enacted in 1999 and addresses, in depth, the issue of VA's reimbursement for emergency treatments. It defines "emergency treatment" as "medical care or services furnished, in the judgment of the Secretary—"

3

(A) when Department or other Federal facilities are not feasibly available and an attempt to use them beforehand would not be reasonable;

(B) when such care or services are rendered in a medical emergency of such nature that a prudent layperson reasonably expects that delay in seeking immediate medical attention would be hazardous to life or health; and

(C) until—

(i) such time as the veteran can be transferred safely to a Department facility or other Federal facility and such facility is capable of accepting such transfer; or

(ii) such time as a Department facility or other Federal facility accepts such transfer if—

(I) at the time the veteran could have been transferred safely to a Department facility or other Federal facility, no Department facility or other Federal facility agreed to accept such transfer; and

(II) the non-Department facility in which such medical care or services was furnished made and documented reasonable attempts to transfer the veteran to a Department facility or other Federal facility.

38 U.S.C. 1725(f)(1).

When emergency treatment is at issue, the provision states that the Secretary "shall reimburse a veteran . . . for the reasonable value of emergency treatment furnished the veteran in a non-Department facility" if the veteran is "an active [VA] health-care participant" and is "personally liable" for the emergency treatment. § 1725(a)(1), (b)(1). An active health-care participant is a veteran who is "enrolled in the health care system established under section 1705(a) of title 38 or received VA healthcare under chapter 17 within the 24-month period preceding the emergency treatment.[2] § 1725(b)(2).

### B. Facts

Veteran Paul Van Dermark resides in Thailand. He served in the Navy from June 1963 until May 1967. Following service, he applied for disability compensation and was granted service

---

[2] Under section 1705(a), the Secretary is directed to "establish and operate a system of annual patient enrollment" following a specific prioritization list; the first category includes veterans with service-connected disabilities rated 50% or greater, and the second category is made up of veterans with service-connected disabilities rated 30% or 40%. 38 U.S.C. § 1705(a)(1)-(2).

connection for a right wrist and thumb disability, right shoulder capsulitis, bronchitis, and hemorrhoids. His combined schedular evaluation eventually reached 90% and he was assigned a total disability rating based on individual unemployability. He is not service connected for any heart-related condition.

In May 2016, Mr. Van Dermark started experiencing cardiac symptoms and underwent preliminary testing, which revealed an abdominal aortic aneurism. He contacted VA's FMP on May 5 to request reimbursement for medical bills he had already incurred and to inquire about his entitlement to reimbursement for a planned surgery. On May 14, he was informed that the FMP could not reimburse him because his treatments were not related to a service-connected disability. Mr. Van Dermark went ahead with his planned surgery and was hospitalized at Bangkok Hospital from May 22 to 26, 2016. The following month, VA personnel from the FMP formally denied his claim for reimbursement because the treatment he received was not related to a service-connected disability. When he disagreed, VA issued a Statement of the Case in October 2016 citing 38 U.S.C. § 1724 and its implementing regulation, 38 C.F.R. § 17.35, as the reasons for denial. He appealed to the Board, asserting that he was entitled to reimbursement under 38 U.S.C. § 1728(a)(3).

Meanwhile, Mr. Van Dermark had renewed cardiac problems in 2018 and sought VA treatment. He flew to Guam on May 4, 2018, for testing and observation at the United States Naval Hospital. He was then transferred to Tripler Army Medical Center in Hawaii on May 9 and underwent a coronary catheterization two days later. He was scheduled for a coronary artery bypass graft surgery on May 23 to replace his aortic valve. But he grew dissatisfied with the nursing staff and the outpatient accommodations that VA had arranged and decided to return to Thailand.

Upon returning, Mr. Van Dermark received medical care at the Bangkok Hospital on May 27, 2018. He again sought reimbursement from VA but was denied. He appealed this denial as well.

The Board issued a decision on April 17, 2019, denying reimbursement for expenses from both May 2016 and May 2018. First, the Board found that section 1724 was the controlling statute. This section "governs hospital care, medical services and nursing home care abroad," and the term "emergency medical treatment" as used in sections 1725 and 1728, the Board concluded, is encompassed by "medical services." R. at 12 (internal quotation marks omitted). The Board reasoned that the emergency treatment reimbursement provisions in sections 1725 and 1728 are

5

constrained by section 1724's general prohibition against VA providing medical care abroad. Under section 1724, Mr. Van Dermark's May 2016 and May 2018 cardiac treatments at Bangkok Hospital could not be reimbursed by VA because they did not relate to a service-connected condition or a non-service-connected condition associated with or aggravated by a service-connected condition; nor was Mr. Van Dermark participating in a chapter 31 rehab program.[3] The Board did not determine whether any care received at the Bangkok Hospital constituted emergency treatment. This appeal followed.

## II. ANALYSIS

Mr. Van Dermark doesn't dispute the Board's analysis under section 1724. Instead, he argues that section 1724 is inapplicable to his claim for reimbursement. He begins by observing that both "furnish" and "reimburse" appear in sections 1725 and 1728 and reasons that these distinct terms must be presumed to bear distinct meanings. Relying on the common definitions of the words, he contends that "furnish" in the context of 1725 and 1728 requires the direct provision of healthcare, while "reimburse" signifies payment for healthcare provided by another party. And invoking the consistent meaning canon, Mr. Van Dermark asserts that "furnish" in section 1724(a) should be understood to have the same meaning it does in sections 1725 and 1728. Thus, he reasons that section 1724 does not affect his claim for reimbursement because VA was not asked to "furnish" him care but to "reimburse" him for care. With section 1724's bar cleared, Mr. Van Dermark believes that he is entitled to reimbursement for purportedly emergency treatment at the Bangkok Hospital in 2016 and 2018 under either section 1728(a)(3) because of his TDIU rating or section 1725(b) as an active VA healthcare participant personally liable for the non-VA treatment he received.

In response, the Secretary argues that, when read as a whole, the statutory scheme embedded within chapter 17 demonstrates a congressional intent only to provide or pay for medical care outside of the United States through the FMP established by section 1724.

Before reaching the legal issues, however, the Court must address a factual argument interposed by the Secretary. He contends that the medical care Mr. Van Dermark received from

---

[3] But the Board did remand the issue of entitlement to reimbursement for March 2017 treatment at the Bangkok Hospital for a head injury that Mr. Van Dermark asserted was precipitated by his right wrist disability, which *is* service connected. Because remands are not final Board decisions, the Court has no jurisdiction over that matter. *See Sharp v. Shulkin*, 29 Vet.App. 26, 28 n.1 (2017).

the Bangkok Hospital did not constitute emergency treatment as the phrase is defined in section 1725(f) and urges the Court to affirm on those grounds without going further. But whether specific hospital care constitutes emergency treatment is a factual question, and the Board did not make any findings on this issue in its decision. Outside certain circumstances not present here, the Court cannot decide factual questions in the first instance. *See Kyhn v. Shinseki*, 716 F.3d 572, 575 & n.4 (Fed. Cir. 2013). Therefore, the following analysis will presume solely for argument's sake that the care at issue in this case was emergency treatment.

This appeal turns on statutory interpretation. Statutory interpretation is a legal question, and the Court reviews the Board's determinations on legal questions de novo. *Casey v. Wilkie*, 31 Vet.App. 260, 265 (2019). "In determining the meaning of a statutory provision, 'we look first to its language, giving the words used their ordinary meaning.'" *Id.* (quoting *Artis v. District of Columbia*, 138 S. Ct. 594, 603 (2018)). But context "inform[s] any statutory provision's plain meaning." *Id.* Put otherwise: "The meaning of the phrase turns on its context." *Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 413 (2012).

The first relevant term to tackle is "emergency treatment," the meaning of which is easy to ascertain because Congress defined it as "medical care or services furnished" in specific circumstances. 38 U.S.C. § 1725(f)(1). Section 1724(a)'s prohibition covers "hospital or domiciliary care or medical services outside any State." The Board concluded that "emergency treatment" as used in sections 1725 and 1728 "is encompassed by the term 'medical services' in 38 U.S.C. § 1724 and this statute applies to both emergency and non-emergency treatment abroad." R. at 12. Mr. Van Dermark doesn't challenge this conclusion in his opening brief.

In his reply brief, the veteran asserts that "hospital and domiciliary care" as used in section 1724(a) "differs from 'emergency treatment'" as used in sections 1725 and 1728. Reply Br. at 10. But this cursory statement isn't enough to preserve a challenge on appeal to the Board's conclusion. First, it doesn't address the term "medical services," which is what the Board examined. Second, despite the citations in the reply brief, the veteran's opening brief doesn't touch upon the issue at all, and the Court deems challenges not raised in an opening brief forfeited. *Fears v. Wilkie*, 31 Vet.App. 308, 319 n.100 (2019). Finally, even in the reply brief, Mr. Van Dermark never offers any argument to support an assertion that "emergency treatment" isn't covered by section 1724. Therefore, we treat this issue as conceded on appeal.

The other two terms at issue here are "reimburse" and "furnish." Because neither is specifically defined by Congress, the Court looks to their ordinary meaning at the time of enactment. *See New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019). The word "reimburse" in sections 1725 and 1728 meant (and still means) "to pay back (an equivalent for something taken, lost, or expended)." WEBSTER'S NEW INTERNATIONAL DICTIONARY 1914 (3d ed. 1966); MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 1986 (10th ed. 1998). There is no real dispute between the parties over the scope of this term.

The same cannot be said of "furnish." The term's appearance in section 1724 has its origin in 1940 legislation. *See* Act of Oct. 17, 1940, ch. 893, § 4, 54 Stat. 1193, 1195. Back then "furnish" was primarily understood to mean "[t]o provide for; to provide what is necessary for"; it also was defined as "[t]o provide; supply; give; afford," specifically, "[t]o supply (a person or thing *with* something)." WEBSTER'S NEW INTERNATIONAL DICTIONARY 1021 (2d ed. 1934); *accord* THE POCKET OXFORD DICTIONARY 334 (7th ed. 1943). Thus, "furnish" has a potentially broad scope. It can mean to directly provide something or to indirectly provide *for* it.

This is where context comes in. To ascertain the meaning of "furnish" in section 1724(a), Mr. Van Dermark looks to sections 1725 and 1728. *See* Appellant's Br. at 19. In the context of those provisions, he maintains, the word "furnish" must be understood to describe "only" the situation where VA is "directly" providing medical care, whereas "reimburse"—which is used alongside it—means to repay for medical care furnished by another. *Id.* at 16-17. Focusing narrowly on sections 1725 and 1728, there is something to this. The distinction is clear when Congress, for example, instructed the Secretary to "*reimburse* a veteran . . . for the reasonable value of emergency treatment *furnished* the veteran in a non-Department facility." 38 U.S.C. § 1725(a) (emphasis added). Or when it permitted the Secretary, "in lieu of *reimbursing* [a] veteran," to "make payment of the reasonable value of emergency treatment directly—to the hospital or other health facility *furnishing* the emergency treatment." 38 U.S.C. § 1728(b)(1) (emphasis added). In these passages, the word "furnish" appears to exclude the concept of reimbursement.

But the fact that "furnish" may bear this narrow meaning in sections 1725 and 1728 does not support giving it the same meaning elsewhere in chapter 17. For instance, under the Veterans Community Care Program, the Secretary is instructed in certain circumstances to "furnish hospital care, medical services, and extended care services to a covered veteran through health care providers" like a "Federally-qualified health center" or the "Indian Health Service." 38 U.S.C.

§ 1703(c), (d)(1). Likewise, when hospital care or a medical service is not "feasibly available" in a VA facility, the Secretary is authorized to "furnish such care or service to such covered individual through an agreement under this section with an eligible entity or provider to provide" them. 38 U.S.C. § 1703A(a)(1)(A). Other examples abound. *See, e.g.*, 38 U.S.C. §§ 1712A(e)(1), 1720C(b)(1), 1720I(c)(1), 1788(c). In these provisions, it's clear that Congress is using "furnish" to mean, not the direct provision of healthcare by VA, but the assumption of the cost of healthcare provided by non-VA entities.

Mr. Van Dermark admitted as much at oral argument. Departing somewhat from his initial briefing position, he conceded that "furnish" as used in chapter 17 can mean the provision of healthcare directly by VA or the provision of healthcare by VA via a contract with a third party. But he still maintained that "furnish" cannot mean after-the-fact reimbursement of healthcare provided by a third party. Oral Argument at 10:47-12:56.

But Congress "need not, and frequently does not, use the same term to mean precisely the same thing in two different statutes, even when the statutes are enacted at about the same time." *Sec. Indus. Ass'n v. Bd. of Governors of Fed. Res. Sys.*, 468 U.S. 137, 174-75 (1984) (O'Connor, J., dissenting). And as noted above, the relevant portions of chapter 17 were not enacted at the same time but over the course of 50 years. The consistent-usage canon—which Mr. Van Dermark implicitly invokes when he consults the way "furnish" is used in VA's other healthcare statutes— "readily yields to context, especially when a statutory term is used throughout a statute and takes on distinct characters in distinct statutory provisions." *Return Mail, Inc. v. U.S. Postal Serv.*, 139 S. Ct. 1853, 1863 (2019) (quotation marks omitted); *see also id.* at 1865 ("The consistent-usage canon breaks down where Congress uses the same word in a statute in multiple conflicting ways.").

Because Congress has not defined "furnish" and has used it to mean distinct things throughout chapter 17, section 1724(a) itself provides the most important contextual clues to the scope of "furnish" in that provision. Several considerations persuade us that subsection (a) uses the term "furnish" in its broader sense of "provide for." Thus, the general ban on VA's furnishing medical services abroad also bars reimbursement for medical services, save for the exceptions specified in later subsections of 1724.

First, when the verb "furnish" was added to section 1724's precursor in 1940, the existing law—a VA regulation—stated: "No person shall be entitled to receive domiciliary, medical, or hospital care, including treatment, who resides outside of the continental limits of the United States

9

or its Territories or possessions." § 4, 54 Stat. at 1195. To this, Congress tacked on the following: "*Provided*, That in the discretion of the Administrator of Veterans' Affairs necessary hospital care, including medical treatment, *may be furnished* to veterans who are citizens of the United States and who are temporarily sojourning or residing abroad, for disabilities due to war service in the armed forces of the United States." *Id.* (emphasis added).

A Senate report on the amendment indicated that the exception in 1940 was created because VA thought the existing law worked "a hardship on certain veterans suffering with service-connected disabilities . . . and others who, from necessity rather than choice, are temporarily residing abroad in the promotion for American interests." S. REP. NO. 76-2198, at 5-6 (1940). Importantly for present purposes, the report stated that the existing law barring entitlement to medical or hospital care abroad was "in consonance" with another VA regulation that "limit[ed] the right to treatment primarily to that which can be afforded in Government facilities." *Id.* at 5. With the amendment, Congress decided to "permit the hospitalization of such veterans who have had war service and who are American citizens, when necessary for the relief of service-connected disabilities." *Id.* at 6. In other words, although there were no VA (i.e., "Government") facilities abroad to treat service-connected disabilities, VA could allow non-VA facilities in other countries to furnish such treatment by picking up the tab. As Congress continued to recognize almost two decades later, "American veterans residing in other countries, such as France, England, or Germany, are not given medical care *at VA expense* for non-service-connected disabilities." S. REP. NO. 85-1469, at 5 (1958) (emphasis added).

That "furnish" bore this broad meaning of indirect provision by VA is supported by the VA Administrator's first report to Congress after the amendment discussed above took effect.[4] The Administrator noted that the

> prohibition against the rendering of medical treatment for beneficiaries in foreign countries . . . was repealed by a law authorizing such treatment for applicants suffering from service connected conditions who could establish the fact that they have American citizenship. By agreement, the Department of State undertook to establish that required status before *arranging*, as heretofore, *the treatment of such citizens living in foreign countries* (other than Canada, where direct arrangements

---

[4] We take judicial notice of the statements and other facts put forth in the VA report because this is "extra-record evidence . . . from sources whose accuracy cannot reasonably be questioned." *Euzebio v. McDonough*, 989 F.3d 1305, 1323 (Fed. Cir. 2021) (quotation marks omitted); *see Dodd v. TVA*, 770 F.2d 1038, 1039 n.1 (Fed. Cir. 1985) (taking judicial notice of facts contained in the Tennessee Valley Authority's annual report to Congress); *see also Terrebonne v. Blackburn*, 646 F.2d 997, 1000 n.4 (5th Cir. June 1981) (en banc) ("Absent some reason for mistrust, courts have not hesitated to take judicial notice of agency records and reports.").

10

are made through a reciprocal agreement with the Department of Pensions and National Health, Ottawa).

ANNUAL REPORT OF THE ADMINISTRATOR OF VETERANS AFFAIRS FOR THE FISCAL YEAR ENDED ON JUNE 30, 1941, at 14 (1942) (emphasis added) ("1941 ANNUAL REPORT"). The report goes on to say that the only application received during that fiscal year (from a veteran residing in Cuba) was rejected "because the conditions for which he requested treatment had no relation to [his] former military service." *Id.* The subject is concluded with the statement that political "conditions obtaining in Europe at the present time make practically impossible the furnishing of medical treatment to citizens of the United States who are residing in countries now occupied by German military forces." *Id.* at 14-15. These passages reveal, as a matter of historical fact, that VA would "furnish" medical treatment to veterans abroad by arranging for its provision through non-VA entities.

Indeed, no other understanding seems possible since, at the time, VA did not have under its control or propose development of a single facility outside the United States. *See* 1941 ANNUAL REPORT at 107-109. And, although VA reported that more than $2 million in pension and compensation benefits were paid to veterans in "United States possessions and foreign countries," *id.* at 91, the portion of the Administrator's report detailing the total number of veterans remaining under VA hospital treatment at the end of fiscal year 1941 lists hospital locations only in the continental United States and its then-"possessions": Alaska, the Canal Zone, Hawaii, the Philippine Islands, and Puerto Rico, *id.* at 44-47. This silence is telling, especially when VA was able to report the specific amounts of pension and compensation received by the precise numbers of veterans or their dependents living in foreign countries. *Id.* at 98-101.

So, the historical evidence shows that, at the time that Congress permitted medical treatment for service-connected disabilities to be "furnished" to veterans abroad, VA had no healthcare infrastructure abroad to provide such treatment directly but would provide it as appropriate by paying for it. Thus, when Congress in 1940 affirmed the general bar on the furnishing of VA medical treatment to veterans outside the United States but permitted such treatment to be furnished for service-connected disabilities, it was using the word "furnish" in the indirect sense of the Agency arranging or paying for treatment provided by non-VA entities.

And, indeed, that is how the FMP is administered today. Per VA's policy manual: "FMP may provide *reimbursement* for all foreign-provided, medically necessary services associated with

11

the treatment of adjudicated service-connected disabilities or any disability associated with and held to be aggravating a service-connected condition, as well as care for Veterans participating in a rehabilitation program." FOREIGN MEDICAL PROGRAM POLICY MANUAL § 1.01.III.B. Generally, claims for "payment or reimbursement for expenses of medical care or services" must be filed within two years following the date the care or service was rendered or the date of discharge from inpatient hospitalization. *Id.* § 3.01.I.A. Or, as the Agency's brochure explaining the FMP's mechanics to veterans advises more simply: "You may pay the provider and then file a claim by submitting the bill, medical documentation and proof of payment to the FMP office. Or your provider, if willing, may submit the bill and medical documentation to FMP for payment."[5]

With the proper contextual meaning of "furnish" in section 1724(a) established, we can put it together with the other definitions noted above to understand the scope of the congressional limitation on VA medical treatment abroad. When Congress directed in section 1724(a) that "the Secretary shall not furnish hospital or domiciliary care or medical services outside any State," it meant that the Secretary may not provide for or arrange veterans' "hospital or domiciliary care or medical services" abroad. Since emergency treatment is a type of medical service, section 1724 necessarily orders the Secretary not to "provide for" emergency treatment abroad. Reimbursing for the cost of emergency treatment, either by paying a veteran back or directly paying a non-VA provider, is a way of providing for that treatment and, in fact, is generally the only way VA may arrange for treatment in other countries. Thus, "reimburse" falls within the meaning of "furnish" as used in section 1724(a). Under a plain reading of the relevant terms, section 1724 barred VA from paying for Mr. Van Dermark's emergency cardiac treatment at Bangkok Hospital because he was not service connected for any cardiac condition. (Nor was any such treatment needed in connection with his participation in a chapter 31 rehab program.)

Nothing in section 1725 or 1728 persuades us that they meant to alter VA's healthcare obligations outside the United States. Those provisions make no reference to medical services abroad—and recall that emergency treatment is defined as a type of medical care or service. 38 U.S.C. § 1725(f)(1). "When a statute gives no clear indication of an extraterritorial application, it has none." *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010). Rather, when Congress wished to add exceptions to, or otherwise alter the scope of, the general bar on VA's furnishing of

---

[5] https://www.va.gov/COMMUNITYCARE/docs/pubfiles/brochures/FMP_brochure.pdf.

medical services abroad, it did so in section 1724 itself, not elsewhere. We will not presume that sections 1725 and 1728 were meant to apply in foreign countries like Thailand. *See id.* at 261 ("Rather than guess anew in each case, we apply the presumption [against territoriality] in all cases, preserving a stable background against which Congress can legislate with predictable effects.").

Relatedly, given the carefully delineated circumstances in section 1724 in which VA is obliged to provide for veterans' medical care in foreign countries, we think Congress would have made it clear if it intended to dramatically expand those circumstances to include "[a]ny disability" if a veteran has TDIU, 38 U.S.C. § 1728(a)(3), or is "an active Department health-care participant," 38 U.S.C. § 1725(b)(1). *See Romag Fasteners, Inc. v. Fossil, Inc.*, 817 F.3d 782, 790 (Fed. Cir. 2016). But no intention on Congress's part to do so is apparent.

Likewise, the fact that courts generally presume that Congress intends a specific statute to govern over more general ones supports our conclusion. *See Arzio v. Shinseki*, 602 F.3d 1343, 1347 (Fed. Cir. 2010). Section 1724, as noted above, is the only one in chapter 17 that addresses the instances in which VA may provide for the medical care veterans receive abroad. Sections 1725 and 1728 make no reference to their territorial scope. Where Congress addresses VA's extraterritorial healthcare responsibilities in one statute but says nothing about it in others, we think it proper to conclude that the former takes precedence. Moreover, "Congress is presumed to legislate against the backdrop of existing law." *Procter & Gamble Co. v. Kraft Foods Global, Inc.*, 549 F.3d 842, 848 (Fed. Cir. 2008). At the time section 1728 was enacted in 1973 and section 1725 in 1999, section 1724(a)'s general prohibition against the furnishing of medical services for non-service-connected disabilities abroad had existed for several decades.

After considering the foregoing, the Court concludes that sections 1725 and 1728 permit reimbursement for veterans who receive emergency treatment from domestic, non-VA healthcare providers. In contrast, section 1724 covers when veterans abroad who receive medical care or services—including emergency treatment—may receive reimbursement. As relevant here, because Mr. Van Dermark was not seeking medical care in connection with a service-connected condition or as part of a rehab program, the Board properly determined that his May 2016 and May 2018 treatments at Bangkok Hospital for cardiac issues—even if qualifying as emergency treatment—could not, under section 1724, be reimbursed by VA.

## III. CONCLUSION

Accordingly, the Court AFFIRMS the April 17, 2019, Board decision.


GREENBERG, *Judge*, dissenting: The line between a plain language analysis and interpreting ambiguity in a statute has never been more blurred. What the majority calls historical context to support a plain language finding could very easily be described as reviewing legislative history to uncover the meaning of an ambiguous term. With the utmost respect for my esteemed colleagues, I have no alternative but to dissent.

It is well established that Congress created a scheme where veterans are a highly regarded class of citizens. *See Henderson v. Shinseki*, 562 U.S. 428, 440 (2011) (stating that longstanding Congressional "solicitude [for veterans] is plainly reflected in the [Veterans Judicial Review Act of 1988], as well as in subsequent laws that place a thumb on the scale in the veteran's favor in the course of administrative and judicial review of VA decisions" (internal quotes omitted)). This principle has been considered and enforced since the earliest days of the Republic. *See Hayburn's Case*, 2 U.S. (2 Dall.) 409, 410 n. (1792).

As Justice Alito recognized, "We have long applied 'the canon that provisions for benefits to members of the Armed Services are to be construed in the beneficiaries' favor.'" *Henderson*, 562 U.S. at 441 (quoting *King v. St. Vincent's Hospital*, 502 U.S. 215, 220-21 n. 9 (1991)); *Brown v. Gardner*, 513 U.S. 115, 117-18 (1994) (noting "the rule that interpretive doubt is to be resolved in the veteran's favor" cited in *King*). Not to be viewed merely as an afterthought,

> the pro-veteran canon is a traditional tool of construction. It requires that we discern the purpose of a veterans' benefit provision in the context of the veterans' benefit scheme as a whole and ensure that the construction effectuates, rather than frustrates, that remedial purpose: that benefits that by law belong to the veteran go to the veteran.

*Kisor v. McDonough*, 995 F.3d 1316, 1327 (Fed. Cir. 2021) (Reyna, J., dissenting).

The Court should be interpreting statutes in a way that helps veterans, otherwise we diminish and minimize the purpose and role of the entire statutory scheme created by Congress specifically to favor veterans; in fact, the pro-veteran canon requires us to interpret statutes in this context. Today's decision sets a dangerous precedent for interpretation of future veterans benefits statutes. For the foregoing reasons, I dissent.

14