IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
September 11, 2024 Session

**SAINT CLAUDE RENEL, ET AL. v. DREXEL CHEMICAL COMPANY**

**Appeal from the Circuit Court for Shelby County**
**No. CT-1758-23      Mary L. Wagner, Judge**
_____

**No. W2023-01693-COA-R3-CV**
_____

The Plaintiffs in this case, who live in the Dominican Republic, were allegedly injured by toxic herbicides used in the sugar cane industry. Following the Plaintiffs' filing of a lawsuit against the Defendant, a Tennessee corporation, pursuant to the Tennessee Products Liability Act, the Defendant moved to dismiss the case on several grounds. Although the trial court rejected the viability of a number of these defenses asserted by the Defendant at the motion to dismiss stage, the trial court concluded that the case should be dismissed on the basis that "the TPLA does not have extraterritorial application." The trial court also opined that, "even if a case were to proceed in Tennessee, the applicable law would be the law of the Dominican Republic" but noted that the Plaintiffs "have only set forth a specific claim under the TPLA." For the reasons stated herein, we affirm the trial court's dismissal of the case.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed and Remanded**

CARMA DENNIS MCGEE, J., delivered the opinion of the Court, in which ARNOLD B. GOLDIN, J., joined. J. STEVEN STAFFORD, P.J., W.S., filed a separate dissenting opinion.

Frank L. Watson, III, Wiliam F. Burns, and William E. Routt, Memphis, Tennessee, and Robert T. Vance, Philadelphia, Pennsylvania, for the appellants, Saint Claude Renel, *et al.*

Cannon F. Allen, John D. Woods, III, and Annabelle Harris, Memphis, Tennessee, for the appellee, Drexel Chemical Company.

**OPINION**

**BACKGROUND AND PROCEDURAL HISTORY**

The Plaintiffs in this case consist of 165 workers in the Dominican sugar cane

industry. The named Defendant is Drexel Chemical Company ("Drexel"), a Tennessee corporation that, per the filed complaint, "wrongfully participated in the promotion, manufacture, exportation, importation, design, sale, distribution and use of certain toxic herbicides, which were used by Plaintiffs in the cultivation of sugar cane." According to the Plaintiffs, Drexel, "in violation of Tennessee law, wrongfully caused the Plaintiffs to be exposed to herbicides which it both knew, or should have known, were defectively designed and would cause injury to the Plaintiffs." The Plaintiffs further alleged that Drexel, "in violation of Tennessee law, failed to warn them about the defective nature of its herbicides." The herbicides were, according to the Plaintiffs, "in a defective condition and . . . unreasonably dangerous when they left [Drexel's] possession and/or control." According to the complaint, another company imports and distributes Drexel products in the Dominican Republic "under contract with Drexel," and sugar cane plantation owners purchase the herbicides and "direct the Plaintiffs to use those herbicides" at the plantations where they work. The complaint alleged that Drexel's misconduct "was planned, organized and orchestrated by defendant in Tennessee and the Dominican Republic for the purpose (that was realized) of earning profits that were received by Defendant."

Although the Plaintiffs in this matter had originally sued Drexel by filing a complaint in the Shelby County Circuit Court on April 4, 2022, that case was voluntarily non-suited. The present case ensued the following year, however, when an identical complaint against Drexel was filed in the same court. Per the complaint, the Plaintiffs' varying, respective tenures working in the sugar cane industry admitted of a broad range. For instance, whereas the complaint averred that one Plaintiff worked "for 4 months in the cultivation and harvesting of sugar cane," it alleged that another worked "for 50 years." Regarding the subject of herbicide exposure, the complaint submitted that "Plaintiffs are exposed to [Drexel's] herbicides each day they use them in their work," while further contending that "Plaintiffs are exposed to [Drexel's] herbicides year-round." The complaint also alleged that "Plaintiffs are injured by [Drexel's] toxic herbicides continuously in their employment . . . ." As for the recovery they pursued, the Plaintiffs specifically sought relief under the Tennessee Products Liability Act ("TPLA"), Tenn. Code Ann § 29-28-101, et seq.

Following the filing of the complaint against it, Drexel filed a motion to dismiss asserting several grounds for dismissal. First, Drexel maintained that the Plaintiffs' claim under the TPLA should be dismissed "because the TPLA has no extraterritorial application." In the alternative, Drexel submitted that the complaint should be dismissed due to "statutes of repose and . . . statutes of limitation" and because the Plaintiffs had allegedly failed to include sufficient factual allegations to state a claim under Tennessee law.

Although the trial court did not ultimately countenance the alternative arguments Drexel had made in support of its motion, the court did find merit in Drexel's position regarding the impropriety of extraterritorial application. In reaching its conclusion, it

applied a two-step process the United States Supreme Court has adopted for analyzing exterritoriality issues involving federal statutes, a jurisprudential framework which stems from a canon of construction known as "the presumption against extraterritoriality." *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 335 (2016). Under that framework, the court asks, "[a]t the first step," "whether the presumption against extraterritoriality has been rebutted—that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially." *Id.* at 337. If the statute is not deemed to be extraterritorial, the court then determines at the second step "whether the case involves a domestic application of the statute," which is accomplished by looking to the "'focus' of congressional concern." *Id.* at 336-37. "If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." *Id.* at 337.

In conducting an analysis pursuant to the above framework, the trial court initially concluded that "[t]he TPLA does not contain a clear, affirmative indication that it applies extraterritorially." Then, shifting its attention to the "focus" of the statute, at the second step, the trial court held that "the TPLA focuses on the protection of the ordinary consumer from defective products and warnings." According to the court, "[t]he relevant conduct – injuries by the product, use of the product, failures of any warnings – all occurred in the Dominican Republic." Therefore, the court held that this case involved an impermissible extraterritorial application.

Continuing on in its order, the trial court opined as follows:

> This application is consistent with Tennessee choice of law provisions. In *Hataway v. McKinley*, 830 S.W.2d 53 (Tenn. 1992), the Tennessee Supreme Court adopted the "most significant relationship" approach. "According to this theory, the law of the jurisdiction where the injury or accident occurred will apply unless another jurisdiction has a more significant relationship to this litigation." *In re Bridgestone/Firestone*, 138 S.W.3d 202, 208 (Tenn. Ct. App. 2003). Here, all alleged injuries occurred in the Dominican Republic. Additionally, all use of the products occurred in the Dominican Republic. Any proof regarding the use of the products, which products were used, what amounts of products were used, when the products were used, how the products were used, the use or lack of use of any product labels or warnings, the availability of any product labels or warnings, etc. is all located solely in the Dominican Republic. Further, the products and warnings would be required to comply with Dominican Republic regulations or laws. As in *Bridgestone*, Tennessee cannot be said to have a more significant relationship than the Dominican Republic. Accordingly, even if a case were to proceed in Tennessee, the applicable law would be the law of

the Dominican Republic.

Plaintiffs, however, have only set forth a specific claim under the TPLA. Consequently, because the TPLA does not have extraterritorial application the Plaintiffs fail to state a claim upon which relief may be granted and Drexel is entitled to dismissal of this action.

This appeal followed.

## ISSUES PRESENTED

Both sides raise issues for our review in this appeal. For their part, the Plaintiffs challenge the trial court's holding that the TPLA does not have extraterritorial application, alleging error in the second step of the trial court's analysis. Although Drexel requests that we affirm that holding, it independently raises issues devoted to challenging the trial court's rejection of its alternative grounds for dismissal and asks that we "find that Plaintiffs' claims are time-barred by the statute of limitations and statutes of repose, and that Plaintiffs failed to state a claim under the TPLA."

## STANDARD OF REVIEW

"On appeal, a trial court's decision to dismiss . . . for failure to state a claim creates a question of law which we review de novo with no presumption of correctness." *Metro. Gov't of Nashville v. Bd. of Zoning Appeals of Nashville*, 477 S.W.3d 750, 754 (Tenn. 2015).

## DISCUSSION

The present dispute among the parties is largely underscored by a disagreement as to whether our state statutory law, the TPLA, can apply extraterritorially. As noted above, the trial court dismissed this case due to its conclusion that the case would involve an impermissible extraterritorial application of the TPLA. Whereas the Plaintiffs of course maintain that the trial court's conclusion on that issue was incorrect, Drexel asks that we affirm the trial court's decision.

We begin with a brief overview of the "extraterritoriality canon," which is "[t]he doctrine that a statute presumptively has no extraterritorial application."[1] Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 428 (2012).

---

[1] We note that this is "a canon of construction, or a presumption about a statute's meaning, rather than a limit upon Congress's power to legislate." *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010). As such, whether a statutory provision has extraterritorial reach is "a merits question" rather than a matter of subject matter jurisdiction. *Id.* at 253-54.

According to Scalia and Garner,

> Since the rise of the nation-state, countries have avoided subjecting people to conflicting laws (and disrupting one another's legal systems) by international consensus that a nation's law governs action within its territorial jurisdiction—even action by other nations' citizens. This is not to say that international law forbids extraterritorial application. A country may, if it wishes, subject its own citizens to its laws wherever they are, and may subject all persons in other countries to its laws with regard to action that has a substantial effect within its territory. But in practice, that is the exception rather than the rule. The same principle applies to the laws of our states, though the Constitution may place some limits on extending a state's laws to the territory of sister states.
>
> It has long been assumed that legislatures enact their laws with this territorial limitation in mind. Indeed, medieval law had the maxim *Statuta suo clauduntur territorio, nec ultra territorium disponunt*—"Statutes are confined to their own territory and have no extraterritorial effect." The legislature need not qualify each law by saying "within the territorial jurisdiction of this State." That is how statutes have always been interpreted, and "[i]t is presumable that Congress legislates with knowledge of our basic rules of statutory construction."

*Id.* at 268-69 (footnotes omitted).[2]

Tennessee courts have repeatedly recognized the principle of extraterritoriality. *See, e.g.*, *Kirkland v. Calhoun*, 248 S.W.302, 304 (Tenn. 1923) ("A local statute has no extraterritorial force, and can be exercised only upon persons and property within the jurisdiction of the state where such statute is enacted.") (quotation omitted); *Van Tuyl v. Carpenter*, 188 S.W. 234, 237 (Tenn. 1916) ("foreign laws can have no extraterritorial efficacy, save in those instances which are governed by the 'full faith and credit' clause of our federal Constitution"); *Snyder v. Yates*, 79 S.W. 796 (Tenn. 1904) ("The statute laws of a state have of themselves no extraterritorial force, and whatever effect they have in foreign states they have by virtue of the laws of such state, or under the doctrine of the comity of states."); *Illinois Cent. R. Co. v. Davis*, 58 S.W. 296, 298 (Tenn. 1900) ("It is true the statute has no extraterritorial effect[.]"); *W. U. Tel. Co. v. Mellan*, 45 S.W. 443, 444 (1898) (explaining that certain statutes "were not intended to have any extraterritorial effect"); *Sherwood v. Microsoft Corp.*, No. M2000-01850-COA-R9-CV, 2003 WL

---

[2] The authors note that some courts in recent times have "watered down" or "ignored" the presumption, but their doing so "is not consistent." *Id*. at 271-72. Scalia and Garner suggest restoring the canon to its previous form and taking it seriously in the future. *Id.* at 272; *but see* William S. Dodge, *Presumptions Against Extraterritoriality in State Law*, 53 U.C. Davis L. Rev. 1389, 1392 (2020) ("The current draft of the *Restatement (Third) of Conflicts* takes the position that states should not have presumptions against extraterritoriality.").

21780975, at *21 n.28 (Tenn. Ct. App. July 31, 2003) ("A state's power to regulate interstate commerce is still limited in some situations; for example, by the limitations on the extraterritorial powers of state government."); *Lien v. Couch*, 993 S.W.2d 53, 57 (Tenn. Ct. App. 1998) ("Tennessee cannot demand that its laws be given extraterritorial effect."); *Hutchison v. Tenn. Farmers Mut. Ins. Co.*, 652 S.W.2d 904, 906 (Tenn. Ct. App. 1983) (explaining that a certain Tennessee statute had "no extra territorial effect"); *Carter v. Carter*, 191 S.W.2d 451, 480-81 (Tenn. Ct. App. 1944) ("It is elementary that legislation can have no extraterritorial effect.  It is binding only within the limits of the sovereignty enacting it. It is not to be presumed that by use of language without limitation the legislature intends to confer authority upon persons not within its jurisdiction, although by appropriate language it may authorize designated officials of another state to do specified acts and make those acts effectual within its own sovereignty."); *Halliburton v. Elder*, 4 Tenn. App. 452, 457 (1927) (recognizing "the general rule that the statutes of a State have no extra-territorial effect"); *cf. Kaufman v. State*, 225 S.W.2d 75, 76 (Tenn. 1949) ("Our Constitution has no extraterritorial effect.").

Many other state courts have recognized the same.  *See, e.g.*, *Hetman v. Schwade*, 317 S.W.3d 559, 564 (Ark. 2009) ("We first note the general rule that statutes have no effect except within the state's own territorial limits."); *Focus Fin. Partners, LLC v. Holsopple*, 250 A.3d 939, 970 (Del. Ch. 2020) ("Delaware law presumes that a law is not intended to apply outside the territorial jurisdiction of the State in which it is enacted.") (quotation omitted); *Auld v. Forbes*, 848 S.E.2d 876, 881 (Ga. 2020) (quoting *Glock v. Glock*, 247 F.Supp.3d 1307, 1318 (N.D. Ga. 2017)) ("Georgia statutes have a presumption against extraterritorial application. Thus, absent a clear statement to the contrary, the Georgia courts refrain from applying statutes extraterritorially."); *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 852 (Ill. 2005) ("[W]e note the long-standing rule of construction in Illinois which holds that a statute is without extraterritorial effect unless a clear intent in this respect appears from the express provisions of the statute.") (quotations omitted); *Jahnke v. Deere & Co.*, 912 N.W.2d 136, 141 (Iowa 2018) ("It is a well-settled presumption that state statutes lack extraterritorial reach unless the legislature clearly expresses otherwise."); *Union Underwear Co., Inc., v. Barnhart*, 50 S.W.3d 188, 190 (Ky. 2001) ("We begin our analysis with the well-established presumption against extraterritorial operation of statutes.  That is, unless a contrary intent appears within the language of the statute, we presume that the statute is meant to apply only within the territorial boundaries of the Commonwealth."); *Tuttle v. Dobbs Tire & Auto Centers, Inc.*, 590 S.W.3d 307, 311 (Mo. 2019) ("[T]his Court applies the longstanding presumption that Missouri statutes, absent express text to the contrary, apply only within the boundaries of this state and have no extraterritorial effect."); *Smith v. Pro Camps, Ltd.*, 226 A.D.3d 936, 938 (N.Y. App. Div. 2024) ("A statute is presumed to apply only within the state unless expressly stated otherwise.") (quotations omitted); *Goldstein v. Sabatino*, 690 S.W.3d 287, 293 (Tex. 2024) (explaining that "the presumption against legislative extraterritoriality" means "a statute has no extraterritorial effect unless the intention to have the statute operate beyond the limits of the state is clearly expressed or indicated by its language, purpose,

subject matter, or history") (quotation omitted); *Nevares v. M.L.S.*, 345 P.3d 719, 727 (Utah 2015) ("Under a deeply rooted and longstanding canon of construction, statutes are presumed not to have extraterritorial effect.").[3]

In the case at bar, the single issue presented by Plaintiffs on appeal is "[w]hether the trial court erred in finding that the Tennessee Product[s] Liability Act, Tenn. Code Ann. § 29-28-101 et seq. (the 'TPLA') does not have extraterritorial application, and consequently that Appellants failed to state a claim upon which relief could be granted." Both sides argue the viability of their respective positions through the lens of the two-step process outlined by the United States Supreme Court in *RJR Nabisco, Inc. v. European Community*, the very framework adopted by the trial court here to analyze the extraterritoriality issue. To generally return to the framework of that two-step process again:

> At the first step, we ask whether the presumption against extraterritoriality has been rebutted—that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially. . . . If the statute is not extraterritorial, then at the second step we determine whether the case involves a domestic application of the statute, and we do this by looking to the statute's "focus." If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory.

*RJR Nabisco*, 579 U.S. at 337.

Here, Plaintiffs argue that the trial court erred in its "application" of the two-step extraterritoriality framework utilized in *RJR Nabisco* and *Morrison*, but only at the second step of the trial court's analysis.[4] They argue:

---

[3] We note that "[t]he states that have adopted presumptions do not distinguish between interstate and international cases when applying those presumptions." Dodge, 53 U.C. Davis L. Rev. at 1403. In other words, the "[c]ourts do not distinguish between these two contexts, applying the same rules regardless of whether another state or another nation is involved." *Id.* at 1421; *but see Union Underwear Co.*, 50 S.W.3d at 192 (Ky. 2001) (observing that "unlike acts of Congress, there can be no assumption that the Commonwealth has the power to enforce its laws beyond its borders," and therefore, "[t]his gives us even greater reason to be cautious when determining whether a law of the Commonwealth should be applied extraterritorially").

[4] "Because a finding of extraterritoriality at step one will obviate step two's 'focus' inquiry," it is usually preferable to begin with step one. *RJR Nabisco*, 579 U.S. at 338 n.5. However, "courts have the discretion to begin at step two 'in appropriate cases.'" *WesternGeco LLC v. ION Geophysical Corp.*, 585 U.S. 407, 413 (2018) (quoting *RJR Nabisco*, 579 U.S. at 338 n.5); *see, e.g.*, *Sec. & Exch. Comm'n v. Binance Holdings Ltd.*, 738 F. Supp. 3d 20, 71 (D.D.C. 2024) ("Because the SEC has alleged only domestic violations under step two, . . . the Court will address only that step of the analysis.") (quotation omitted).

Below, the trial court applied the two-step extraterritoriality analysis to the TPLA. The trial court first found the TPLA does not contain a clear, affirmative indication that it applies extraterritorially. Turning to the second step, the trial court then addressed the focus of the TPLA. Apparently relying on the text of three (3) provisions of the TPLA, the trial court concluded the focus of the TPLA is "the protection of the ordinary consumer from defective products and warnings." The trial court then made two conclusory statements, presumably about or derived from the "facts" relevant to the cause of action alleged in the Complaint, to support its conclusion that "'the case involves an impermissible extraterritorial application regardless of whether other conduct occurred in U.S. territory.'" The trial court's application of the second step of the extraterritoriality analysis is flawed.

(record citations omitted). Plaintiffs go on to argue that "the trial court's conclusion about the focus of the TPLA is incorrect."[5]

It is notable that the Plaintiffs do not appear to quarrel with the trial court's conclusion that the TPLA "does not contain a clear, affirmative indication that it applies extraterritorially." Their only apparent criticism relates to the trial court's consideration of the second step discussed in *RJR Nabisco* and other federal cases, with the Plaintiffs simply submitting that "[t]he trial court's application of the second step of the extraterritoriality analysis is flawed." We conclude, however, that the trial court was not required to apply the *RJR Nabisco* and *Morrison* two-step analysis in the first place, in order to determine whether the TPLA, a state law, applied extraterritorially.

A decision by the United States Court of Appeals for the Second Circuit is instructive. In *Barron v. Helbiz, Inc.*, No. 21-278, 2021 WL 4519887, at *1-2 (2nd Cir. Oct. 4, 2021), the plaintiffs asserted various common law claims arising out of a cryptocurrency scheme as well as "state statutory claims" under New York law. The federal district court applied the *Morrison* analysis and dismissed the claims. *Id.* at *1. The plaintiffs argued on appeal that "the district court erred by applying *Morrison* to their state law claims," and the Second Circuit agreed. *Id.* at *2. The Court explained that in *Morrison*, "[t]he Supreme Court grounded [its] holding in a canon of statutory construction known as the presumption against extraterritoriality—'absent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application.'" *Id.* (quoting *RJR Nabisco*, 136 S.Ct. at 2100). However, "[t]he *Morrison* Court, in analyzing the federal securities claim at issue there, did not assert that its analysis applied to claims that are not brought under Section 10(b) of the Securities Exchange Act,

---

[5] The "focus" of the statute "is 'the objec[t] of the statute's solicitude'—which can turn on the 'conduct,' 'parties,' or interests that it regulates or protects." *WesternGeco*, 585 U.S. at 416 (quoting *Morrison*, 561 U.S. at 267).

such as the state law claims made here." *Id.* at \*3. "While Plaintiffs' various claims might eventually fail for lacking adequate domesticity, that determination must be made pursuant to a more tailored approach that analyzes any Section 10(b) claims under *Morrison*, and *separately, any state law claims under New York's rules for the extraterritorial application of its law.*") *Id.* (emphasis added) (citing *Glob. Reinsurance Corp.–U.S. Branch v. Equitas Ltd.*, 969 N.E.2d 187, 195 (N.Y. 2012) ("The established presumption is, of course, against the extraterritorial operation of New York law . . . .")).

As one author explains, "For the past three decades, the federal presumption against extraterritoriality has been the principal tool that the U.S. Supreme Court has used to determine the geographic scope of federal statutes. But the federal presumption does not apply to state statutes, the scope of which is a question of state law." Dodge, 53 U.C. Davis L. Rev. at 1390; *see also* Maggie Gardner, *Deferring to Foreign Courts*, 169 U. Pa. L. Rev. 2291, 2348 n.344 (2021) ("To be clear, the federal presumption against extraterritoriality does not apply to state statutes."); John T. Parry, *Rethinking Personal Jurisdiction After Bauman and Walden*, 19 Lewis & Clark L. Rev. 607, 628 (2015) ("the federal presumption against extraterritoriality does not apply to state statutes, and states are free to apply their own presumption, or not, subject again to constitutional constraints"); Jeffrey A. Meyer, *Extraterritorial Common Law: Does the Common Law Apply Abroad?*, 102 Geo. L.J. 301, 304, 330 (2014) ("When it is Congress that passes a law, the Supreme Court presumes the law to stop at the nation's borders. . . . State courts do the same for their own states' statutes. . . . As for state statutes, state courts have long recognized a statutory presumption against their extraterritoriality, just as the Supreme Court does for federal statutes."); Restatement (Fourth) of Foreign Relations Law § 404 cmt. a & note 5 (2018) ("As a presumption about congressional intent, the federal presumption against extraterritoriality applies only to federal statutes and causes of action. Some States apply their own presumptions against extraterritoriality to State statutes. . . . Subject to constraints imposed by federal law, the geographic scope of State statutes is a question of State law.").

Because "the federal presumption against extraterritoriality does not apply to state statutes," federal courts "determine the geographic scope of such statutes by applying whatever interpretive rules the state supreme court would apply."[6] Dodge, 53 U.C. Davis L. Rev. at 1441; *see, e.g.*, *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 111 (2nd Cir. 2012) ("California courts have long recognized a presumption against the extraterritorial application of state law. Like the Supreme Court of California, we therefore presume that the California legislature did not intend a statute to be operative, with respect to occurrences outside the state, unless such intention is clearly expressed or reasonably to be inferred from the language of the act or from its purpose, subject matter or history.")

---

[6] "Some states have adopted presumptions against extraterritoriality that are generally consistent with the federal presumption, others have presumptions against extraterritoriality that differ from the federal presumption in important respects, and still others have no presumption against extraterritoriality at all." Dodge, 53 U.C. Davis L. Rev. at 1391.

(quotations omitted); *Carolina Trucks & Equip., Inc. v. Volvo Trucks of N. Am., Inc.*, 492 F.3d 484, 489 (4th Cir. 2007) ("Since the text of the [the statute] in no way compels [the plaintiff's] reading, we must not adopt it in light of South Carolina rules of statutory construction that forbid giving the state's laws extraterritorial reach. In construing a state law, we look to the rules of construction applied by the enacting state's highest court. South Carolina rules of construction provide that statutes must not be read to operate outside the state's borders. The South Carolina Supreme Court has written repeatedly that South Carolina statutes have no extraterritorial effect.") (quotations omitted); *Highway Equip. Co. v. Caterpillar Inc.*, 908 F.2d 60, 62-64 (6th Cir. 1990) (concluding that the Illinois Franchise Disclosure Act could not be applied extraterritorially by considering Illinois law on extraterritoriality); *Patel v. Facebook, Inc.*, 932 F.3d 1264, 1275-76 (9th Cir. 2019) (considering an Illinois statute and Illinois's extraterritoriality doctrine); *In re Capps*, 438 B.R. 668, 672 (Bankr. D. Idaho 2010) ("the determination of whether a statute has extraterritorial effect is a matter of state law interpretation"); *see also* Restatement (Third) of Conflict of Laws § 5.01 TD No 3 cmt. c (2022) ("In determining the scope of another State's laws, a court applies a presumption against extraterritoriality only to the extent and in the manner that the other State has done so, as part of its internal law.").

Thus, we return to Tennessee law regarding extraterritoriality, even though it was not cited by the parties on appeal.[7] *See Kocher v. Bearden*, 546 S.W.3d 78, 85 n.8 (Tenn.

---

[7] We note the Tennessee Supreme Court's decision in *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 515 (Tenn. 2005), in which the Supreme Court granted permission to appeal to determine whether an indirect purchaser may bring an action under the Tennessee Trade Practices Act against defendants involved in a price-fixing scheme. The Court concluded that "an indirect purchaser may bring an action under Tennessee Code Annotated section 47-25-106 for conduct in violation of the TTPA even though the indirect purchaser is a non-resident of this state." *Id.* at 520. The Court then determined whether the conduct complained of fell within the scope of the TPPA. *Id.* The Court considered what "standard to employ in examining whether the effects of the anticompetitive conduct on Tennessee trade or commerce fall within the scope of the TTPA" and determined that the proper standard was a "substantial effects" standard, requiring courts to decide "whether the alleged anticompetitive conduct affects Tennessee trade or commerce to a substantial degree." *Id.* at 522-23. Nothing in the opinion mentions extraterritoriality. Because of this, the author of *Presumptions Against Extraterritoriality in State Law*, 53 U.C. Davis L. Rev. at 1391, listed Tennessee among the states that have "rejected a presumption against extraterritoriality," even though "there are older cases articulating a presumption against extraterritoriality." *Id.* at 1417-18, 1451. We decline to interpret the Court's silence in the same manner. *See Clinton Books, Inc. v. City of Memphis*, 197 S.W.3d 749, 753 (Tenn. 2006) ("the omission of any discussion of the trial court's jurisdiction in *Planned Parenthood* and *Davis-Kidd* should not be interpreted as altering the general rule prohibiting state equity courts from enjoining enforcement of a criminal statute"); *Memphis Bonding Co., Inc. v. Crim. Ct. of Tennessee 30th Dist.*, 490 S.W.3d 458, 467 (Tenn. Ct. App. 2015) ("We respectfully disagree with [the court's] conclusion that the supreme court 'clearly departed from the unequivocal declaration' in *Zirkle* by its silence in *Davis-Kidd* and *Clinton Books*. We consider the supreme court's unequivocal statements in *Zirkle* and *Hill v. Beeler*, 199 Tenn. 325, 333, 286 S.W.2d 868, 871 (1956) to be controlling."); *see also Ivie v. AstraZeneca Pharms., LP*, No. 3:19-CV-01657-JR, 2021 WL 5167283, at *3 n.5 (D. Or. Nov. 5, 2021), *rev'd and remanded on other grounds*, 2023 WL 3563007 (9th Cir. May 19, 2023) ("Recent scholarship has suggested that Oregon's presumption against extraterritoriality of its state laws is 'unclear' despite the clear and undisturbed precedent of *Swift & Co. See* William S. Dodge,

Ct. App. 2017) (quoting *Coffee v. Peterbilt of Nashville, Inc.*, 795 S.W.2d 656, 658 n.1 (Tenn. 1990)) ("It is the duty of this Court to apply the controlling law, for which there is a basis in the record, whether or not cited or relied upon by the parties."). Aside from the long line of Tennessee cases previously discussed, this Court considered the extraterritorial effect of a Tennessee statute recently in *Williaford v. Holiday Inns, Inc.*, No. 24, 1988 WL 77627, at *2 (Tenn. Ct. App. July 28, 1988) *perm. app. denied* (Tenn. Oct. 31, 1988), which involved the Tennessee Human Rights Act. In *Williaford*, the plaintiff was a Tennessee resident who was employed at a Holiday Inn in Memphis, Tennessee, prior to being transferred to a Holiday Inn in West Memphis, Arkansas, where she was allegedly discriminated against on the basis of her sex. *Id.* The only relief the plaintiff sought was pursuant to the Tennessee Human Rights Act, and the trial court dismissed her claim for failure to state a claim. *Id.* On appeal, the plaintiff argued that Tennessee courts "ha[d] the power to apply" the provisions of the Tennessee Human Rights Act statutes to her case. *Id.* at *2. However, we stated that "[w]e should first determine whether *the statute itself* purports to apply extraterritorially." *Id.* (emphasis added). We explained that the Tennessee Supreme Court has previously held that "'[t]he statute laws of a State have of themselves *no extraterritorial force*, and whatever effect they have in foreign States they have by virtue of the laws of such State, or under the doctrine of the comity of States.'" *Id.* (quoting *Snyder*, 79 S.W. at 796) (emphasis added). Examining the language used in the Tennessee Human Rights Act, we concluded that "the legislature intended for the Act to apply to torts committed within this state."[8] *Id.* at *3; *see also Whitehead v. Sterling Jewelers, Inc.*, 648 F. Supp. 3d 951, 958 (W.D. Tenn. 2023) (agreeing with the reasoning of *Williaford* based on the clear language of the THRA).

Thus, the pivotal question in this case, applying Tennessee law, is whether the statute itself, the Tennessee Products Liability Act, purports to apply extraterritorially.[9] *Williaford*, 1988 WL 77627, at *2; *see also Snyder*, 79 S.W. at 796 ("The statute laws of a state have of themselves no extraterritorial force"). This is essentially the same question

---

*Presumptions Against Extraterritoriality in State Law*, 53 U.C. Davis L. Rev. 1389, 1449 (2020). Plaintiff has not identified any case or statute that calls *Swift & Co.*'s rule into question, and this Court has not found any such precedent on its own initiative. The Court assumes that the presumption against extraterritoriality announced in *Swift & Co.* remains binding precedent in the State of Oregon, and therefore follows its holding in deciding this question."). "[L]ower courts are bound by the decisions of higher courts." *Barger v. Brock*, 535 S.W.2d 337, 341 (Tenn. 1976); *see also Newkirk v. Newkirk*, No. C.A. 121, 1987 WL 28059, at *1 (Tenn. Ct. App. Dec. 17, 1987) *remanded* (Tenn. Nov. 21, 1988) ("this Court is bound by pronouncements of the Supreme Court irrespective of their vintage, and must follow them until they are overruled or modified by legislative action").

[8] We also "assume[d] that the legislature of 1978 when it passed the human rights legislation was well aware of the established law in this state [at that time] that the law of the place where the tort occur[red] [would] be controlling." *Id.* at *3.

[9] *See, e.g.*, Tenn. Code Ann. § 50-6-115(c)(1)(B) (referencing "[t]he extraterritorial provisions of this chapter" in the workers' compensation law); *see also Tuttle*, 590 S.W.3d at 312 n.11 (Mo. 2019) ("Missouri's workers' compensation law is an example of the General Assembly expressing an intent for its extraterritorial application.").

the trial court answered when applying step one of the *RJR Nabisco* analysis, which the trial court framed as follows: "First, the Court asks whether the presumption against application has been rebutted. That is, does the statute at issue contain a clear affirmative indication that it applies extraterritorially." The trial court answered this question in the negative, finding that "[t]he TPLA does not contain a clear, affirmative indication that it applies extraterritorially." Plaintiffs have not constructed any argument to the contrary on appeal. They do not argue that the TPLA purports to apply extraterritorially. The only issue they raised on appeal was "[w]hether the trial court erred in finding that the [TPLA] does not have extraterritorial application," due to a flawed analysis of the second step of the *RJR Nabisco* test regarding the statute's focus and related conduct.[10]

---

[10] We note that Plaintiffs' argument appears to misapprehend the effect of the second step of the analysis. The trial court found that "the TPLA focuses on the protection of the ordinary consumer from defective products and warnings." Plaintiffs argue that "the focus of the TPLA is the responsibility imposed on manufacturers and sellers to produce and sell products that are safe and not defective or unreasonably dangerous." Because Plaintiffs suggest a different "focus" of the TPLA, they also argue that the trial court's conclusion that "all relevant conduct occurred in the Dominican Republic was misplaced." Plaintiffs' brief states, "The trial court's application of the second step of the extraterritoriality analysis is flawed. Properly applied, the second step of the extraterritoriality analysis indicates that because 'the conduct relevant to the statute's focus occurred on the United States, . . . the case involves a permissible *domestic application* even if other conduct occurred abroad.'' *RJR Nabisco*, 579 U.S. at 326." (emphasis added). However, the heading of this very section of Plaintiffs' brief states, "The Court May Apply the TPLA Extraterritorially in this Case[.]" They argue that "[t]he [TPLA] can be applied extraterritorially," and they "respectfully request that the Court find that the TPLA has extraterritorial application in this case[.]" The issue framed by Plaintiffs in their brief was: "[w]hether the trial court erred in finding that the [TPLA] does not have extraterritorial application[.]" In Drexel's brief on appeal, it interpreted Plaintiffs' brief to mean that "Plaintiffs agree that they are asking that the TPLA be applied extraterritorially."

Under the federal framework, "[w]hen a statute gives no clear indication of an extraterritorial application, it has none." *Morrison*, 561 U.S. at 255. "If the statute is *not* extraterritorial, then at the second step we determine whether the case involves a domestic application of the statute, and we do this by looking to the statute's 'focus.'" *RJR Nabisco*, 579 U.S. at 337 (emphasis added). According to the Supreme Court:

> The first step asks "whether the presumption against extraterritoriality has been rebutted." *RJR Nabisco*[, 579 U.S. at 337]. It can be rebutted only if the text provides a "clear indication of an extraterritorial application." *Morrison*[, 561 U.S. at 255]. If the presumption against extraterritoriality has not been rebutted, the second step of our framework asks "whether the case involves a domestic application of the statute." *RJR Nabisco*, 579 U.S., at 337[.] Courts make this determination by identifying "the statute's 'focus'" and asking whether the conduct relevant to that focus occurred in United States territory. *Ibid.* If it did, then the case involves a permissible domestic application of the statute. See *ibid.*

*WesternGeco*, 585 U.S. at 413. So, we consider the statute's "focus" if we find the statute "does not apply extraterritorially." *RJR Nabisco,* 579 U.S. at 337; *see Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 418 (2023) ("If a provision is not extraterritorial, we move to step two[.]"); *Nestle USA, Inc. v. Doe*, 593 U.S. 628, 633 (2021) ("where the statute, as here, does not apply extraterritorially, plaintiffs must establish that 'the conduct relevant to the statute's focus occurred in the United States'") (quoting *RJR Nabisco*, 579 U.S. at 337); *U.S. v. Alahmedalabdaloklah*, 94 F.4th 782, 801 (9th Cir. 2024), *cert. denied*, (U.S. Dec. 9, 2024) ("At Step One, we presume that a statute applies only domestically and ask whether

Under these circumstances, we conclude that the trial court's use of the two-step federal framework was harmless error,[11] and Plaintiffs' limited argument on appeal regarding the second step of the analysis is irrelevant. Having rejected the narrow argument presented on appeal, we affirm the trial court's holding that "the TPLA does not have extraterritorial application." *See Innerimages, Inc. v. Newman*, 579 S.W.3d 29, 44 (Tenn. Ct. App. 2019) ("appellate courts have the authority to affirm a trial court's decision if it 'reached the right result for the wrong reason'") (quoting *Shutt v. Blount*, 194 Tenn. 1, 249 S.W.2d 904, 907 (1952)). We therefore affirm the trial court's decision to dismiss the Plaintiffs' action under the TPLA. As a consequence of our disposition on the extraterritoriality question, we pretermit review of the issues Drexel has raised in an attempt to establish alternative bases for dismissal.[12]

---

Congress has affirmatively and unmistakably instructed that the provision at issue should apply to foreign conduct. . . . If an affirmative indication is absent, the statute applies only domestically and we proceed to Step Two, where we ask whether the conduct relevant to the statute's focus occurred in the United States.") (quotations omitted). Regardless of the lack of clarity in Plaintiffs' argument regarding the second step, however, it is clear that they did not develop any argument regarding the first step of the analysis.

[11] We clarify that there was no agreement below to apply the federal framework. In fact, during the hearing on the motion to dismiss, counsel for Drexel specifically discussed *Snyder* and several other Tennessee decisions referenced in this opinion.

[12] In March 2025, this Court entered an order stating that additional briefing would be beneficial to the court's disposition of this matter. *See Welch v. Oaktree Health & Rehab. Ctr. LLC*, 674 S.W.3d 881, 888-89 (Tenn. 2023). We directed the parties to file supplemental briefs on the limited issues of (1) whether the federal presumption against extraterritoriality applies to state statutes, and (2) if not, what extraterritoriality principles apply in Tennessee.

In response, Plaintiffs filed a short supplemental brief stating that they were unable to find "any case that expressly applies the federal presumption against the extraterritorial application of federal statutes set forth in cases such as *RJR Nabisco, Inc.*[, *Morrison*,] and *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108 (2013), to a state statute." Thus, they agreed that the federal presumption against extraterritoriality does not expressly apply to state statutes. They also noted that "some state courts impose a presumption against the extraterritorial application of state laws based on that state's organic law[.]" Still, they urged this Court to apply the two-step framework.

Drexel likewise stated that it was "unable to find any federal opinions that apply the two-step framework to state statutes in either an interstate or international context." As a result, Drexel argued that "[n]o second step need apply." Drexel contended that the sole question should be whether the TPLA stated an intent to apply extraterritorially. It noted the trial court's conclusion that the TPLA does not contain a clear, affirmative indication that it applies extraterritorially, and "Plaintiffs [did] not dispute this holding" on appeal. Thus, Drexel contended that this Court should affirm the trial court's holding that the TPLA does not apply extraterritorially.

In light of these briefs, we find it perplexing that the dissent deems our reliance on an opinion of this Court as "misplaced" when the dissent proposes relying on federal law instead. *Williaford* considered the extraterritorial effect of a Tennessee statute and relied on controlling authority of the Tennessee Supreme Court in its analysis, as do we. The dissent rightly notes that *Williaford* did not engage in an analysis of whether there could be a domestic application of the relevant statute under the second prong of the federal framework. But the federal framework has never been applied by a Tennessee court to a state statute. The dissent frames that as the "real issue in this appeal" only by reframing the issue presented on appeal by Plaintiffs for them and suggesting that federal law or something similar should apply. The issue presented on appeal is "[w]hether the trial court erred in finding that the [TPLA] does not have

## CONCLUSION

In light of the foregoing discussion, we affirm the trial court's decision to dismiss the Plaintiffs' action under the TPLA. Costs of this appeal are taxed to the appellants, Saint Claude Renel, et al., for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE

---

extraterritorial application," yet the dissent insists that this Court must answer "whether the facts of this case permit a domestic application of the TPLA." We disagree, respectfully.